PER CURIAM.
We have on appeal the judgment of the trial court convicting appellant Gerald Murray of first-degree murder and sentencing him to death.[1] For the reasons that follow, we affirm his conviction and sentence.
I. FACTS AND PROCEDURAL BACKGROUND
This is the third direct appeal following the fourth trial and third conviction of Gerald Murray for the September 1990 murder of fifty-nine-year-old Alice Vest. In his first trial in 1994, the jury found Murray guilty of first-degree murder, burglary of a dwelling with assault, and sexual battery and recommended death by a vote of eleven to one. The trial court followed the jury’s recommendation and sentenced Murray to death. On appeal, this Court reversed the convictions and sentences and remanded the case for a new trial because of the erroneous qualification of an expert witness who testified as to DNA evidence and the improper admission of DNA evidence at trial. See Murray v. State, 692 So.2d 157, 157-58 (Fla.1997).
Murray was retried in March 1998, but that trial ended in a mistrial due to a hung jury. He was then tried a third time in February 1999, and the jury convicted him of first-degree murder, burglary with assault, and sexual battery, and recommended death by a vote of twelve to zero. On appeal, this Court once again reversed because of the improper admission of DNA evidence. See Murray v. State, 838 So.2d 1073, 1077 (Fla.2002). Murray had his fourth trial in 2003 and he was again convicted of first-degree murder, burglary with assault, and sexual battery.
The evidence presented at the fourth trial revealed that on September 15, 1990, the victim, Alice Vest, arrived home around 11:30 p.m. after having dinner with a friend. When her friend called the next morning on September 16, however, Ms. Vest did not answer the phone. Con *1113 cerned, the friend called one of Ms. Vest’s neighbors and asked him to check on her. The neighbor went to Ms. Vest’s home and observed that one of her window screens was out of the window and that her screen door was propped open. Her phone lines had been cut. After telling his wife to call 911, the neighbor and another man looked inside the home and discovered Ms. Vest’s body draped off of her bed with her head on the floor.
According to the medical examiner’s testimony, the cause of death was strangulation with multiple stab wounds as a contributing factor. Ms. Vest was also badly beaten with a metal bar, a candlestick holder, and a broken bottle that left bruising around her neck, breasts, and knees. She also had a black eye, a broken jaw, multiple contusions, and at least twenty-four stab wounds over her face, neck, upper and lower back, abdomen and thigh. Most of the stab wounds were knife wounds, but some were consistent with infliction by a pah’ of scissors found near her body. Ms. Vest had been strangled with a web belt and two electrical cords. She was also both vaginally and anally raped.
According to James Fisher, earlier on September 15, 1990, Murray, Steve Taylor,[2] and Fisher played pool together after which, at around 11:50 p.m., Fisher dropped Murray and Taylor off at a corner less than a mile from Murray’s home. Fisher then went home and went to bed.
Juanita White, who lived approximately two miles from the victim’s house, testified that, around 12:40 a.m., she saw Murray and Taylor in her barn and watched the men run away after she sent her dog to attack them. Murray’s brother further testified that both Taylor and Murray left town the next day.
Evidence recovered from the scene of the crime included six footprints, five from a Britannia shoe, which Taylor was known to wear, and one that was unidentified. No fingerprints were recovered from the scene that could be tied to either Taylor or Murray. Semen was found inside the victim but the results were inconclusive. Semen was also discovered on a blouse and on a comforter and was found to be the same blood type as Taylor but not Murray. None of the blood spatters at the scene could be tied to either Taylor or Murray. But pubic hairs recovered from the victim’s body and from a nightgown were found to have the same microscopic characteristics as Murray’s pubic hair, but not Taylor’s. Jewelry stolen from the victim’s home was linked to both Taylor and Murray.
Additional evidence presented at trial revealed that approximately six months after his indictment for the murder of Alice Vest, Murray escaped from prison. One of his co-escapees, Anthony Smith, testified that, while out, Murray told him about his role in Vest’s murder. According to Smith, Murray said that on the night of the murder Taylor came over to his house and wanted to go out. Murray initially refused, but Taylor was eventually able to change his mind after the two drank some beer. Thereafter, Taylor convinced Murray to break into a house. Together, the pair broke into what Murray thought was an unoccupied residence. When Murray discovered the owner was home, he wanted to leave, but Taylor grabbed the female occupant, handed Murray a knife, and sexually assaulted her. Afterwards, Murray *1114 had the victim perform oral sex on him. Murray then wandered through the house looking for things to steal. He returned to the bedroom five or ten minutes later and discovered that Taylor had stabbed the victim about fifteen or sixteen times but she was not dead. Murray and Taylor then secured some sort of cord and, together, they choked the woman to death. After they killed her, they took whatever was valuable and left. Approximately seven months after his escape, Murray was captured in Las Vegas, Nevada.
The jury in Murray’s fourth trial reached a verdict of guilty as charged on all counts. During the penalty phase, the State introduced evidence of Murray’s other violent felonies. But, pursuant to Murray’s instructions, the defense did not introduce any mitigation evidence. After the penalty phase closing arguments, the jury recommended a death sentence by a vote of eleven to one.
Thereafter, the court held a Spencer[3] hearing and Murray again declined to present any mitigation evidence. The next day, the trial court followed the jury’s recommendation and sentenced Murray to death, finding that the aggravators outweighed the mitigating circumstances. Specifically, the trial court found four aggravating factors: (1) Murray was previously convicted of three felonies involving violence (great weight); (2) he was engaged in a burglary and/or sexual battery at the time of the commission of the murder (immense weight); (3) the crime was committed for financial gain (some weight); and (4) the crime was especially heinous, atrocious and cruel (great weight). The trial court rejected two statutory mitigating circumstances: (1) the crime was committed by another person, and Murray’s participation was relatively minor; and (2) Murray’s capacity to appreciate the criminality of his conduct was substantially impaired. However, the trial court found the following nonstatutory mitigating circumstances: (1) the untimely death of Murray’s wife (very little weight); (2) Murray was incapable of forming relationships' with people (very slight weight); (3) he had problems as a youth (little weight); (4) his lack of education and little contact with his father (slight weight); and (5) his mental evaluation after his arrest for aggravated assault (little weight). This appeal followed.
II. ISSUES RAISED ON APPEAL
Murray claims that: (A) the trial court erred by admitting hair evidence recovered from the victim’s body; (B) the trial court erred by admitting hair evidence recovered from the victim’s nightgown; (C) the trial court erred by admitting the testimony of a hair and fiber expert and limiting Murray’s cross-examination of him; (D) the trial court erred by denying Murray’s motion to dismiss his indictment; (E) the trial court erred by denying Murray’s right to interview grand jury witnesses; (F) the trial court erred in allowing the State to strike an African-American juror without providing a legitimate race-neutral reason; (G) the trial court erred by denying Murray’s motion for a mistrial due to juror misconduct; (H) the trial court erred in not giving the jury further instruction regarding the meaning of “abiding conviction of guilt” when requested; (I) the trial court erred in allowing former trial testimony to be read to the jury; (J) the trial court erred in not dismissing his case because of double jeopardy; and (K) there was insufficient evidence to convict Murray of the offenses charged. None of these claims warrant relief.

A. Motion to Exclude Hair Evidence From Victim’s Body

Murray first claims that the trial court erred in admitting certain hair evidence *1115 recovered from the victim’s body. We disagree.
In Murray’s direct appeal following his third trial, this Court found that the trial court did not abuse its discretion in admitting these same hair samples. Specifically, we stated:
Murray contends that the evidence from the victim’s body should have been excluded because it was tampered with or altered. The police claimed to have recovered only two hams from the victim’s body, whereas the expert with the FBI who conducted the tests stated that he received and tested several hairs. Murray challenges this apparent discrepancy.
In support of his claim, Murray points to the portion of the record where Detective Chase testified that he collected two hams from the victim’s body, one from her chest and one from her leg. When asked if he counted the number of hams collected, Chase responded, “I believe it was two hams but I can’t be positive as far as that goes. I mean I didn’t have a microscope or anything to look at hams, but I believe there was two.” Chase testified that he placed the hams in an envelope and then placed the envelope in the property room of the Jacksonville Sheriffs Office. That evidence was later sent to the FBI for comparison. Joseph DiZinno, the expert at the FBI, testified that he received debris from the victim’s nightgown and hams from the victim’s body. When asked by defense counsel how many hairs he examined from the victim’s body, DiZinno responded that he examined “several” Caucasian hairs. However, he stated that the FBI “doesn’t count hairs so ... there could be as few as five and as many as twenty-one” hairs.
We find that Murray did not overcome his initial burden in demonstrating the probability of evidence tampering relative to the hairs collected from the body. Neither the officer who collected the hairs nor the analyst who received the hairs was sure as to the exact number of hairs at issue. Chase thought he collected only two but stated that he was not positive. DiZinno, on the other hand, acknowledged that because he does not count hams, he could not give an exact figure as to how many hairs he received. Murray’s allegations amount to mere speculation, and hence the trial court did not commit error in admitting the hairs into evidence.
Murray v. State, 838 So.2d 1073, 1082-83 (Fla.2002).
The facts in Murray’s fourth trial regarding the hair evidence recovered from the victim’s body, as well as the testimonies of both Chase and Dr. DiZinno were unchanged from Murray’s third trial. Neither Chase nor Dr. DiZinno was sure of the exact number of hairs collected. Because the facts are unchanged since we issued our opinion regarding these hair samples in Murray’s third trial, we apply the same reasoning here. Accordingly, we find no error in the trial court’s admitting the hair evidence recovered from the victim’s body.

B. Admission of Hair Evidence From Victim’s Nightgown

Next, Murray argues that the trial court erred in admitting hair evidence recovered from the victim’s nightgown. We disagree.
Generally, relevant physical evidence can be admitted unless there is evidence of probable tampering. Taylor v. State, 855 So.2d 1, 25 (Fla.2003). Once the objecting party produces evidence of probable tampering, the burden shifts to the proponent of the evidence “to establish a proper chain of custody or submit other evidence that tampering did not occur.” *1116 Id. (quoting Taplis v. State, 703 So.2d 458, 454 (Fla.1997)).
In Murray’s last appeal, this Court found that Murray established probable tampering with hair evidence recovered from the victim’s nightgown and the State failed to explain the discrepancy. See Murray v. State, 838 So.2d at 1083. Thus, we concluded that the trial court erred in admitting the hair evidence at trial. Id. Murray reasons that, because this Court found error in admitting this particular hair evidence at his third trial, then it is also reversible error to admit it at his fourth. This claim is not persuasive, however, because additional facts were placed in evidence. See, e.g., Fla. Dep’t of Transp. v. Juliano, 801 So.2d 101, 106 (Fla.2001) (“Under the law of the case doctrine, a trial court is bound to follow prior rulings of the appellate court as long as the facts on which such decision[s] are based continue to be the facts of the case.”). At Murray’s fourth trial, the State introduced additional facts which explained the discrepancy in the chain of custody.
In Murray’s third trial, the evidence technician testified that, in processing the crime scene, he placed the victim’s nightgown and a bottle of lotion together in one bag, sealed it, and signed his initials. Yet the crime scene analyst testified that when she opened the sealed bag after it was delivered to her in the lab, it only contained a nightgown, not a bottle of lotion. The bottle of lotion was also presented, but it was in its own plastic bag. Because the State failed to explain how these items were separated, this Court found error in admitting the ham evidence recovered from the victim’s nightgown at trial. See Murray v. State, 838 So.2d at 1083.
Prior to Murray’s fourth trial, however, the trial court conducted an eviden-tiary hearing to address the admissibility of this same evidence. During the hearing, two evidence technicians who processed the crime scene testified that the nightgown and lotion were placed in one bag at the crime scene and delivered to the property room at the police department later the same day. Then, two days later, some of the items from the crime scene, including the bag containing the lotion and the nightgown, were moved to the Florida Department of Law Enforcement (FDLE) for further processing. The technicians testified that at FDLE, they opened the bag containing the lotion and nightgown and placed the items into separate bags because they had to go to two separate areas for processing. Then at trial, the latent print expert testified that when he received the bottle of lotion, it was sealed and intact but, when he was done analyzing the bottle for prints, he placed it in a plastic bag to keep it from contaminating the other evidence.[4] Therefore, the State adequately explained the earlier discrepancy, and we find no error in the trial court’s admitting this evidence at Murray’s fourth trial.

C. Admitting DiZinno’s Testimony and Limiting Cross-Examination

Murray’s third claim is the trial court erred by allowing Dr. Joseph DiZinno, the hair and fiber expert, to testify. We disagree.
*1117 Dr. DiZinno’s testimony revealed that some of the hairs recovered from the victim’s body and from her nightgown were pubic hairs which had the same microscopic characteristics as pubic hair that was known to be Murray’s. Consequently, although the hair could not be positively identified, DiZinno concluded that Murray could not be ruled out as a donor of the hair. Murray claims that DiZinno’s testimony should not have been admitted because his method of testing using microscopic ham comparisons does not meet the standards of the scientific community and is therefore unreliable under Frye.[5] That claim lacks merit, however, because this Court has concluded that “[vjisual and microscopic hair comparison is not based on new or novel scientific principles and, therefore, does not require a Frye analysis.” McDonald v. State, 952 So.2d 484, 498 (Fla.2006). Consequently, we do not find that the trial court erred in allowing this testimony.
Murray also contends that his cross-examination of DiZinno was improperly limited because he was not allowed to question him about two investigations of the FBI laboratory—one during the early 1990s while Murray’s hair was being processed and a 2003 investigation of DiZin-no’s then current facility. But this argument was not preserved for appeal.
“For an issue to be preserved for appeal, it must be presented to the lower court, and the specific legal argument or ground to be argued on appeal must be part of that presentation.” Doorbal v. State, 983 So.2d 464, 492 (Fla.2008); see also Farina v. State, 937 So.2d 612, 628 (Fla.2006) (“To preserve an issue, ‘[fjirst, a litigant must make a timely, contemporaneous objection. Second, the party must state a legal ground for that objection. Third ... ‘it must be the specific contention asserted as a legal ground for the objection ... below.’ ”) (quoting Harrell v. State, 894 So.2d 935, 940 (Fla.2005)). “All trial errors ... must be preserved for appeal by making a contemporaneous objection.” Capron v. State, 948 So.2d 954, 956 (Fla. 5th DCA 2007). While no magic words are needed to make a proper objection, the articulated concern must be “sufficiently specific to inform the court of the perceived error.” State v. Stephenson, 973 So.2d 1259, 1262 (Fla. 5th DCA 2008); see Williams v. State, 414 So.2d 509, 511-12 (Fla.1982).
At trial, defense counsel asked the judge, outside the presence of the jury, if he could pursue questioning regarding these investigations and was told that he could not. Thereafter, he did not object or attempt to proffer what evidence any inquiry into a lab investigation would reveal. In order to predicate error, the substance of the evidence must either be apparent or be made known to the court through an offer of proof. See § 90.104, Fla. Stat. (2003); see also Miller v. State, 870 So.2d 15, 17 (Fla. 2d DCA 2003) (“[TJhe issue was not adequately preserved for appeal because defense counsel never proffered the answer.”). Here, because the defense failed to proffer the answer, we do not know whether this line of questioning would have had any bearing on this case. Accordingly, we find that this issue was not preserved.

D. Motion to Dismiss Indictment

Next, Murray maintains that his indictment should be dismissed because the only incriminating evidence that could possibly have been presented to the grand jury was that his DNA matched that of the hairs found at the crime scene. Since this *1118 Court reversed his previous conviction because of the improper admission of DNA evidence, he maintains that the grand jury based its indictment on no evidence at all. Murray’s reasoning is incorrect for several reasons.
First, an indictment results from a hearing only to determine probable cause. It is no more than an accusation, the merits of which will be determined at trial. See Fratello v. State, 496 So.2d 903, 911 (Fla. 4th DCA 1986). Therefore, a court should not, for the purposes of deciding whether to dismiss an indictment, “consider the ... sufficiency of the evidence upon which an indictment or information is based.” Id. (quoting State v. Schroeder, 112 So.2d 257, 261 (Fla.1959)). Even when the State’s case at trial differs materially from the time of the grand jury indictment, this Court has not found error in the trial court’s refusal to dismiss the indictment. See Evans v. State, 808 So.2d 92, 101 (Fla.2001). Rather, this Court finds that due process is implicated when “a prosecutor permits a defendant to be tried upon an indictment which he or she knows is based on perjured, material testimony without informing the court, opposing counsel and the grand jury.” Id. (quoting Anderson v. State, 574 So.2d 87, 91 (Fla.1991)). Here, there are no such implications.
Second, Murray’s claim is purely speculative. He claims that DNA was the only evidence presented against him at the grand jury proceeding, but Murray has no idea what evidence was presented to the grand jury because there are no minutes and the proceedings were not, and were not required to be, recorded. See In re Report of the Grand Jury, 533 So.2d 873, 875 (Fla. 1st DCA 1988) (citing United States v. Head, 586 F.2d 508 (5th Cir.1978); State v. McArthur, 296 So.2d 97 (Fla. 4th DCA 1974)). But, even if evidence of DNA was the only testimony presented to the grand jury, it still would not require the trial court to dismiss the indictment because, even if grand jury testimony is later learned to be false, it is only grounds for dismissing an indictment if the prosecution knew the testimony was false when it was presented. See Evans, 808 So.2d at 101. Here, twelve years and three trials passed between Murray’s indictment and this Court’s holding that the DNA evidence was improperly admitted, and there has been no indication that the DNA evidence was falsely procured, let alone that the prosecution was aware of it and failed to inform Murray or the court.
Finally, there was plenty of other evidence to support the grand jury indictment. Taylor had already been convicted of the crime, for example, and Murray had been placed with Taylor both before and after the murder. Murray also made several incriminating statements to Detective O’Steen the day immediately before his indictment,[6] any of which could have supported probable cause. Accordingly, we *1119 find no error in the trial court’s denial of Murray’s motion to dismiss his indictment.

E. Motion to Interview Grand Jury Witnesses

Murray also claims that, because the minutes of the grand jury proceeding were not recorded, he should be allowed to interview the one witness who testified and the prosecutor. He maintains that the trial court committed reversible error by not granting this request. We disagree.
Section 905.27, Florida Statutes, permits limited disclosure of grand jury evidence for (1) determining the consistency of testimony; (2) determining whether perjury occurred; or (3) in furtherance of justice. Because Murray has not claimed that any trial testimony was inconsistent with grand jury testimony, or that it was perjured, we look to the third prong of the statute, furtherance of justice, for grounds to support his request for these interviews. We do not see how these interviews, if granted, would further justice in his case. Further, Murray does not state a particularized need for these interviews or explain how obtaining access to otherwise secret testimony would help his case. See In re Request for Access to Grand Jury Materials, 838 F.2d 1438, 1441-42 (11th Cir.1987) (“Persons who testified before the grand jury did so with the expectation that their testimony would remain secret.... [Hence,] disclosure [of grand jury records] is appropriate only in those cases in which the need for disclosure outweighs the interest in secrecy.... However ... [t]he [party requesting disclosure] must assert a particularized need for the grand jury records.”); see also Jent v. State, 408 So.2d 1024, 1027 (Fla.1981) (“To obtain access to grand jury testimony, a proper predicate must be laid. Mere surmise or speculation ... is not a proper predicate.”) (citing Minton v. State, 113 So.2d 361 (Fla.1959)). Accordingly, we find that the trial court did not abuse its discretion in denying Murray’s request.

F. Challenge to Juror Strike for Not Providing a Race-Neutral Reason

Murray further claims that the trial court reversibly erred when it allowed the prosecution to strike an African-American venireperson without providing a legitimate race-neutral reason. We disagree.
In Florida, both jurors and litigants have a right to jury selection procedures that are free from discrimination. See Welch v. State, 992 So.2d 206, 211 (Fla.2008) (citing Abshire v. State, 642 So.2d 542, 544 (Fla.1994)). The three-step guideline for resolving an allegation of discrimination in peremptory challenges is set forth in Melbourne v. State, 679 So.2d 759, 764 (Fla.1996) (footnotes omitted), as follows:
A party objecting to the other side’s use of a peremptory challenge on racial grounds must: a) make a timely objection on that basis, b) show that the venireperson is a member of a distinct racial group, and c) request that the court ask the striking party its reason for the strike. If these initial requirements are met (step 1), the court must ask the proponent of the strike to explain the reason for the strike.
At this point, the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If the explanation is facially race-neutral and the court believes that, given all the circumstances surrounding the strike, the explanation is not a pretext, the strike will be sustained (step 3).
See also Farina v. State, 801 So.2d 44, 49 (Fla.2001). “There are no specific words which the court must state to satisfy step three of the Melbourne analysis.” Sim *1120 mons v. State, 940 So.2d 580, 582 (Fla. 1st DCA 2006) (citing Bowden v. State, 787 So.2d 185, 188 (Fla. 1st DCA 2001)); see also Melbourne, 679 So.2d at 765 (“The right to an impartial jury guaranteed by article I, section 16, is best safeguarded not by an arcane maze of reversible error traps, but by reason and common sense.”); Fleming v. State, 825 So.2d 1027, 1029 (Fla. 1st DCA 2002). Rather, the most important consideration is that the trial judge actually “believes that given all the circumstances surrounding the strike, the explanation is not a pretext.” Rodriguez v. State, 753 So.2d 29, 40 (Fla.2000). In determining whether or not a proffered race-neutral reason for a peremptory strike is a pretext, the court should focus on the genuineness of the race-neutral explanation as opposed to its reasonableness. See Farina, 801 So.2d at 49; Rodriguez, 753 So.2d at 40.
In making a genuineness determination, the court may consider all relevant circumstances surrounding the strike. See Melbourne, 679 So.2d at 764. “Relevant circumstances may include — but are not limited to — -the following: the racial makeup of the venire; prior strikes exercised against the same racial group; a strike based on a reason equally applicable to an unchallenged juror; or singling the juror out for special treatment.” Id. at 764 n. 8 (citing State v. Slappy, 522 So.2d 18 (Fla.1988)); see also Booker v. State, 773 So.2d 1079, 1088 (Fla.2000) (“[W]e provided a nonexclusive list of factors a trial court may consider in determining whether the reason given for exercising a peremptory challenge is genuine .... ” (citing Melbourne, 679 So.2d at 764 n. 8)).
“Accordingly, reviewing courts should keep in mind two principles when enforcing the above guidelines. First, perempto-ries are presumed to be exercised in a nondiscriminatory manner. Second, the trial court’s decision turns primarily on an assessment of credibility and will be affirmed on appeal unless clearly erroneous.” Melbourne, 679 So.2d at 764-65 (footnote omitted) (emphasis added); see also Rodriguez, 753 So.2d at 40.
In Farina, 801 So.2d at 50-51, this Court upheld the trial court’s ruling on the defense’s objection to the prosecution’s strike of two African-American jurors, finding no pretext where both jurors seemed hesitant regarding the death penalty. The trial judge stated that he was “supposed to just sustain the challenge if I find that the attorney making it is making it in his or her world of good faith, not whether I agree with it or not.... And I don’t think [the prosecutor] is lying to me.” Farina, 801 So.2d at 50 (quoting trial court record).
Likewise here, we find that the trial court satisfied the Melbourne guidelines. First, it made a sufficient step-one inquiry in asking the prosecution to provide a race-neutral reason for striking Mr. Jones. Subsequently, the prosecution satisfied step two when it provided a facially race-neutral reason by explaining that Mr. Jones was struck because of his feelings on the death penalty:
Prosecution: Your Honor, we strike juror number 26, Mr. Jones.
Court: Give us a race neutral reason.
Prosecution: Yes, sir. His feelings on the death penalty. He first stated that he wouldn’t give a number when asked by Mr. Block I think it was.
Defense: My notes are opposite. He said yes to both on Mr. Jones.
Court You got any other reasons?
Prosecution: No, sir, just his feelings on the death penalty.
Court: I have a note that he agreed.
Prosecution: I thought he said it depends.
*1121 Thereafter, the trial court sustained the strike as Melbourne allows under step three when no pretext is found. Specifically, the judge stated:
Court: Well, at this point I would tentatively allow it because I know Ms. Hobbs is a black female and Mr. Ramsey is a black male and you haven’t moved to strike them so I will allow it for now and see what happens because I don’t believe there is a racial pattern if that’s your recollection. It may well be true.
We find that the trial judge’s statement that “it may well be true” indicates that he did not find pretext or believe that the prosecution was lying to him. See Farina, 801 So.2d at 50. We therefore find that the trial judge satisfied the requirements of Melbourne, 679 So.2d at 765 n. 8.
Furthermore, after reviewing the record, we find that Mr. Jones’s comments did indicate hesitancy regarding the death penalty, especially when compared to answers given by unchallenged jurors. Mr. Jones gave an unintelligible answer to the prosecution when he was asked how he felt about the death penalty:
Prosecution: All right. How do you feel about the death penalty?
Mr. Jones: Well, the way I feel about it whether he or she guilty or not guilty I don’t have anything against it whether he or she guilty or not guilty. I don’t— you know, that’s the way I feel about it right here. He or she guilty or not guilty I don’t know.
Prosecution: Thank you sir.
Also, when asked by defense counsel, he was unable to, or refused to, rate his feelings for the death penalty on a scale of one to five with five being “I strongly support it.” To that question Mr. Jones answered, “I agree but I don’t have a number.” Although four other unchallenged jurors also declined to give any specific scaled number, each of the seated jurors gave direct and affirmative answers to the prosecution when they were asked how they felt about the death penalty. Nine of the twelve jurors simply said, “I agree with it” or “I agree.” The other three stated that they agreed if the State proves its case. Those answers lie in stark contrast to the irresolute answer given by Mr. Jones. Therefore, we find the trial judge’s ruling on genuineness not clearly erroneous under Melbourne. Accordingly, we find no reversible error in allowing the prosecution to strike Mr. Jones.

G. Motion for Mistrial Based on Juror Misconduct

Murray next argues that the trial court erred in not granting his motion for mistrial based on alleged juror misconduct, namely juror Ramsey’s mistaken belief that he personally knew one of the witnesses. We do not find that the trial court abused its discretion in refusing to grant a mistrial.
During trial, Ramsey informed the court that he thought he might know Detective O’Steen. Thereafter, the court called in juror Ramsey and both parties interviewed him regarding his acquaintance. He stated that he initially did not recognize the name, but then it “just clicked” that a police officer with the same last name lived in his neighborhood. He also mentioned to two other jurors that he “needed to speak to the bailiff because a name sounds familiar.” The court then called in Detective O’Steen and, as soon as he saw him, juror Ramsey said, “It’s not him.”
Generally, a new trial will not be granted due to a juror’s nondisclosure of facts, unless those facts are considered material. See McCauslin v. O’Conner, 985 So.2d 558, 561 (Fla. 5th DCA 2008). “A juror’s nondisclosure of information during voir dire is considered material if it is so substantial that, if the facts were known, the defense likely would peremptorily ex- *1122 elude the juror from the jury.” Id. Even if material, the discovery of nondisclosure will warrant a new trial only if (1) the facts are relevant to the juror’s service; (2) they were intentionally concealed on voir dire; and (3) the complaining party’s failure to discover the concealed facts was not due to his own lack of diligence. Id. at 560-61 (citing De La Rosa v. Zequeira, 659 So.2d 239, 241 (Fla.1995)).
Here, Murray claims that he should be granted a mistrial because Ramsey did not reveal that he had a police officer as an acquaintance and neighbor. However, the record does not reveal that Ramsey was ever asked whether he knew any police officers. But even if Ramsey did conceal that fact, it does not pass the Zequeira test for granting a new trial. First, the fact that Ramsey knew a police officer is not material. Ramsey stated that he rarely saw him and did not speak to him during the trial. Further it was not in any way relevant to his service as a juror. Finally, he did not intentionally conceal this fact because Ramsey himself came forward when he believed (albeit mistakenly) that he might know one of the witnesses.
Murray also claims that he was prejudiced by Ramsey’s stating to two other jurors that he thought he knew a witness. We find that any prejudice was cured when the trial judge informed the entire jury that Ramsey did not, in fact, personally know any of the witnesses. Accordingly, we find that the trial court did not abuse its discretion in denying Murray’s motion for a mistrial on this issue.[7]

II. Failure to Give Further Jury Instruction When Requested

Murray further alleges reversible error in the trial court’s failure to give additional guidance on the term “abiding conviction of guilt,” which is part of the *1123 reasonable doubt instruction. He also claims that the language in the standard instruction is similar to that which has been found to be unconstitutional. Here again, Murray failed to preserve this issue for appeal by making a contemporaneous objection. See Capron, 948 So.2d at 956. Therefore, we review the allegation to determine if it is so prejudicial as to constitute fundamental error. Id. (citing Street v. State, 636 So.2d 1297, 1303 (Fla.1994)). We find that it is not.
First, we note that the trial judge was not required to give any further instruction. See Victor v. Nebraska, 511 U.S. 1, 5, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994). In Victor, the United States Supreme Court clarified that the trial court is not required to, or prohibited from, defining “reasonable doubt.” Instead, to comply with its constitutional requirements, the trial court need only instruct the jury “that the defendant’s guilt [must] be proved beyond a reasonable doubt.” Id. Regarding the constitutionality of the language, the Supreme Court has stated that it is the very rare occasion in which a court will find that a definition of reasonable doubt violates due process. Id. The only language it has deemed unconstitutional, was, in its determination, suggestive of a higher degree of doubt than that required under the reasonable doubt standard. See Cage v. Lousiana, 498 U.S. 39, 41, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) (“It is plain to us that the words ‘substantial’ and ‘grave,’ as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard.”).
Here, the jury was given the standard jury instruction for reasonable doubt, which does not contain language suggesting a higher degree of doubt. When the jury asked for further clarification of “abiding conviction of guilt” the trial judge, with the agreement of both parties, informed the jury that the answer they were looking for was already in the instruction. He then reread the paragraphs defining reasonable doubt as having a conviction that is not stable.[8]
We do not find that the language used here suggests a higher degree of doubt than that which is “reasonable,” because the term “stable” does not conjure up the same meaning as “substantial” or “grave.” See Cage, 498 U.S. at 41, 111 S.Ct. 328. Accordingly, we do not find error.

I. Allowing Former Trial Testimony to be Read to the Jury

Murray further claims that the trial court erred by allowing testimony of two witnesses from a prior proceeding to be read to the jury at his fourth trial. We disagree. As we have stated,
The use of prior testimony is allowed where (1) the testimony was taken in the course of a judicial proceeding; (2) the *1124 party against whom the evidence is being offered was a party in the former proceeding; (3) the issues in the prior case are similar to those in the case at hand; and (4) a substantial reason is shown why the original witness is not available.
Holland v. State, 773 So.2d 1065, 1074 (Fla.2000) (quoting Thompson v. State, 619 So.2d 261, 265 (Fla.1993)). The only other requirement for admitting prior testimony is that the party opposed had an opportunity to cross-examine the witness at the prior proceeding. See Holland, 773 So.2d at 1074.
Dr. Floro, the medical examiner who performed Ms. Vest’s autopsy, was unavailable for Murray’s fourth trial. Therefore, over Murray’s objection, the trial court allowed his former testimony to be read to the jury. Despite the fact that the reading of Dr. Floro’s testimony satisfied the above criteria, Murray claims the testimony prejudiced him because he was unable to cross-examine Dr. Floro on new issues that arose during this fourth trial. However, the record reveals that the only new facts that arose during the fourth trial pertained to the chain of custody of certain hair evidence. Because neither of these facts has anything to do with Ms. Vest’s autopsy, we find that Murray was not prejudiced by not being able to question Dr. Floro on new issues or by having his prior testimony read to the jury.
Murray also claims that he was prejudiced by the reading of Juanita White’s testimony at his trial. Like Dr. Floro’s testimony, Ms. White’s testimony satisfied the Thompson criteria: Ms. White was unavailable, her testimony was taken during a prior judicial proceeding to which Murray was a party, the issues were unchanged, and Murray had a prior opportunity to cross-examine her. See Holland, 773 So.2d at 1074. Nevertheless, Murray claims that her testimony never should have been allowed because it was more prejudicial than probative. We disagree.
The issue of relevancy is within the purview of the trial court. Once the trial court has weighed the evidence to determine whether its value was more probative than prejudicial, this Court will not overturn its decision absent an abuse of discretion. See Thigpen v. United Parcel Services, Inc., 990 So.2d 639, 645 (Fla. 4th DCA 2008) (citing Sims v. Brown, 574 So.2d 131, 133 (Fla.1991)).
Ms. White’s testimony revealed probative and relevant facts to the jury. It placed Murray with Taylor and, coupled with Fisher’s estimate of the time he dropped the two off near Murray’s home, helped to establish a general timeline of when the two were together. Further, it placed Murray with Taylor in the general vicinity of the victim’s home on the day of the murder. Accordingly, we find the trial court did not abuse its discretion in allowing the former testimony of Dr. Floro and Juanita White to be read to the jury.
J. Motion to Dismiss Due to Double Jeopardy
Murray claims that any prosecution against him should be barred because of double jeopardy since, at each successive trial, the State improves its case against him. Although he admits that this is not an instance where double jeopardy is normally implicated, he asserts there must be a “breaking point” since he has already been tried four times. We find that double jeopardy is not implicated here.
“[T]he Double Jeopardy Clause’s general prohibition against successive prosecutions does not prevent the State from retrying a defendant who succeeds in getting his conviction set aside on appeal due to some error in the proceedings below.” Gore v. State, 784 So.2d 418, 427 (Fla.2001) (citing Lockhart v. Nelson, 488 U.S. 33, 38, *1125 109 S.Ct. 285, 102 L.Ed.2d 265 (1988)); see also Ruiz v. State, 743 So.2d 1, 8-10 & n. 11 (Fla.1999) (holding that double jeopardy did not bar State from retrying defendant despite the fact that prosecutors “attempted to tilt the playing field and obtain a conviction and death sentence”); Keen v. State, 504 So.2d 396, 402 n. 5 (Fla.1987) (holding double jeopardy did not prevent a retrial of defendant arising from prosecu-torial misconduct). Thus, while it may be true that the State’s case can improve, the rule of double jeopardy is clear. It does not bar the prosecution from retrying a case where, as here, the case was overturned due to error.

K. Sufficiency Review

Lastly, Murray claims that there is insufficient evidence to support his first-degree murder conviction. We disagree.
In death penalty cases, this Court conducts an independent review of the sufficiency of the evidence “to determine whether sufficient evidence exists to support a first-degree murder conviction.” Snelgrove v. State, 921 So.2d 560, 570 (Fla.2005); see also Insko v. State, 969 So.2d 992, 1002 (Fla.2007). If the review reveals that “there is substantial, competent evidence to support the jury verdict,” the decision of the trial court will not be reversed on appeal. Darling v. State, 808 So.2d 145, 155 (Fla.2002) (quoting State v. Law, 559 So.2d 187, 188 (Fla.1989)).
The following evidence presented at trial is consistent with Murray’s guilt: (1) the testimony of a jailhouse informant (Smith) detailing Murray’s confession; (2) the evidence collected from the scene and the testimony of the medical examiner which, together, confirmed the details of the crime as Murray related them to Smith; (3) the testimony of several witnesses who placed Murray with Taylor in the vicinity of the crime near the time the crime was committed; (4) testimony describing the presence of two different shoe prints as well as multiple weapons, implying that more than one person committed this crime; (5) the implication of consciousness of guilt since Murray left town the next day and later escaped from incarceration; (6) evidence connecting Murray and Taylor to Ms. Vest’s stolen jewelry; (7) the incriminating statements Murray made to Detective O’Steen; and (8) the presence of pubic hair recovered from Ms. Vest’s body and nightgown which was found to have the same microscopic characteristics as Murray’s known pubic hair. Based on all of the above, we find the evidence sufficient to support a first-degree murder conviction.
III. PROPORTIONALITY REVIEW
Although Murray did not raise the issue of proportionality in his direct appeal, this Court reviews the proportionality of each death sentence. See Davis v. State, 859 So.2d 465, 480 (Fla.2003). In deciding whether death is a proportionate penalty, the Court considers the totality of the circumstances of the case and then compares the case with other similar capital cases. See Urbin v. State, 714 So.2d 411, 417 (Fla.1998).
The circumstances in the instant case reveal murder by strangulation preceded by beating, stabbing, burglary, and sexual battery. The crime was committed for financial gain and was especially heinous, atrocious, and cruel. Considering those circumstances, the aggravating and mitigating factors weighed by the trial court, and other cases with similar facts, we find the death sentence imposed on Murray is proportionate. See, e.g., Johnston v. State, 841 So.2d 349 (Fla.2002) (finding death sentence proportionate for sexual battery, beating, and strangulation, where court found prior violent felony, murder in the course of a felony, pecuniary gain, and HAC aggravators); Mansfield v. *1126 State, 758 So.2d 636 (Fla.2000) (upholding death sentence where two aggravators, HAC and murder committed during the commission of a sexual battery, outweighed five nonstatutory mitigators); Taylor v. State, 630 So.2d 1038 (Fla.1993) (finding death sentence proportionate for sexual battery and murder in the course of a felony, where crime was HAC and committed for financial gain).
IV. CONCLUSION
For the reasons stated above, we affirm Murray’s convictions and sentence of death.
It is so ordered.
WELLS, LEWIS, CANADY, and POLSTON, JJ., concur.
ANSTEAD, Senior Justice, concurs in part and dissents in part with an opinion, in which QUINCE, C.J., and PARIENTE, J., concur.

. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

. In 1992, Taylor was tried for Vest’s murder and was convicted of first-degree murder, burglary of a dwelling, and sexual battery. Following the jury's recommendation, the trial court sentenced Taylor to death. On appeal, this Court affirmed Taylor’s convictions and sentence. See Taylor v. State, 630 So.2d 1038 (Fla.1993).

. See Spencer v. State, 615 So.2d 688 (Fla.1993).

. Although Murray claims on appeal that he was surprised by the print expert's testimony, the issue was not preserved. At trial, Murray did not object to that testimony, move to strike it, or move for a mistrial due to unfair surprise. Although he told the trial judge at sidebar that he was ''aghast,” it was not a sufficient substitute for a proper objection. See, e.g., Millar Elevator Service Co. v. McGowan, 819 So.2d 145, 147 (Fla. 2d DCA 2002).

. Frye v. United States, 293 F. 1013 (D.C.Cir. 1923); see Hayes v. State, 660 So.2d 257, 262-63 (Fla. 1995) (Florida follows the Frye test to determine the admissibility of new or novel scientific evidence).

. O'Steen was the only witness to testify at the grand jury proceeding. On the day preceding his grand jury testimony, O'Steen spoke with Murray after reading him his Miranda warnings and after Murray waived his right to counsel. At trial, O'Sleen testified that, at that meeting, Murray admitted to him that he was with Taylor the night of September 15, 1990. O'Steen also said that when he told Murray his hair matched the hair recovered from the scene, "[h]e said that Taylor told on himself by ... coming in her, and he said that we didn’t find his come." O'Steen further testified that Murray tried to explain how his hair may have ended up at the scene by stating, "[mjaybe its when I pulled a bag of reefer out of my crotch and gave it to Taylor.” Then he said, "[i]f my hair was on Taylor's clothes and Taylor took off his clothes and raping her on the bed, it would fall off.” O'Steen then asked Murray how he knew those details and he said he just assumed that’s how it was.

. Murray also alleges four other instances of juror misconduct, namely (1) juror Starkey’s actual acquaintance with one of the witnesses; (2) juror Starkey’s conversation with an official in the sheriff’s office concerning the death penalty; (3) allegations that the jury agreed to enter a guilty verdict in exchange for recommending a life sentence; and (4) the bailiff's telling the jury that it was okay for them to pray. However, issues one and two were not preserved for appeal. See Capron v. State, 948 So.2d 954, 956 (Fla. 5th DCA 2007) ("All trial errors ... must be preserved for appeal by making a contemporaneous objection.”). If an issue is not properly preserved for appeal, then it must “be so prejudicial as to constitute fundamental error” in order to warrant a new trial. Capron, 948 So.2d at 956 (citing Street v. State, 636 So.2d 1297, 1303 (Fla.1994)). A review of the record here reveals that the allegations of juror misconduct in issues one and two do not rise to the level of fundamental error.
Although issues three and four were preserved in Murray's written motion for mistrial, we do not find that the trial court abused its discretion in denying a mistrial based on these claims. See England v. State, 940 So.2d 389, 402 (Fla.2006) (“A trial court's ruling on a motion for mistrial is subject to an abuse of discretion standard of review.”). Regarding issue three, during individual interviews conducted at Murray’s request, each juror stated unambiguously that no agreement was made to recommend life imprisonment in exchange for a guilty verdict. Additionally, upon inquiry, each juror stated that he or she believed the evidence proved that the defendant committed the crimes beyond a reasonable doubt. Regarding issue four, upon inquiry, each juror except juror Starkey stated they had no recollection of any juror asking a bailiff if they were allowed to pray. The court also questioned the bailiff who testified that "no permission was asked or given.” Therefore, the Court concluded that "Mr. Starkey was simply mistaken concerning a request. [The bailiffj has been in charge of jurors for years, and he would never answer a question without referring it to the court.” Accordingly, we find that after thoroughly investigating the allegations, the trial judge "received the relevant testimony, and determined there was no misconduct. The trial judge did not abuse his discretion in accepting the jurors' testimony and denying the motion for a mistrial.” Id.

. The actual quoted language of the instruction was:
Whenever the words “reasonable doubt” are used you must consider the following:
A reasonable doubt is not a possible doubt, a speculative, imaginary or forced doubt. Such a doubt must not influence you to return a verdict of not guilty if you have an abiding conviction of guilt. On the other hand, if after carefully considering, comparing and weighing all the evidence, there is not an abiding conviction of guilt, or, if, having a conviction, it is one which is not stable but one which wavers and vacillates, then the charge is not proved beyond every reasonable doubt and you must find Gerald Murray not guilty because the doubt is reasonable. It is the evidence introduced upon this trial, and to it alone, that you are to look for that proof.
A reasonable doubt as to the guilt of Gerald Murray may arise from the evidence, conflict in the evidence or the lack of the evidence.
If you have a reasonable doubt, you should find Gerald Murray not Guilty.