# Third District Court of Appeal

## State of Florida

Opinion filed July 23, 2014.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D13-614
Lower Tribunal No. 09-176-M
_____

**Pierson Villalobos,**
Appellant,

vs.

**The State of Florida,**
Appellee.

An Appeal from the Circuit Court for Monroe County, Ruth L. Becker, Judge.

Carlos J. Martinez, Public Defender, and James Moody, Assistant Public Defender, for appellant.

Pamela Jo Bondi, Attorney General, and Jill D. Kramer, Assistant Attorney General, for appellee.

Before SUAREZ, EMAS and SCALES, JJ.

EMAS, J.

Appellant, Pierson Villalobos ("Villalobos") appeals from a judgment of conviction and sentence, challenging the trial court's failure to dismiss a juror after that juror revealed, during the trial, his knowledge of and relationship with a testifying state witness.

Villalobos was charged with two counts of DUI manslaughter following a car accident in Monroe County. During voir dire, the court read a list of potential witnesses to the jury venire and specifically inquired whether any of the venire members knew of, or had a prior business or social relationship with, anyone on the witness list. The list included blood analyst "Jody Gyokeres of Marathon." Venire members James Stelzer and John Arvidson remained silent in response to the court's question and did not acknowledge that they knew Ms. Gyokeres. Stelzer and Arvidson were both eventually selected as jurors.[1]

Trial ensued and the State presented evidence that while intoxicated and driving in Monroe County, Villalobos crossed the median line and struck another car, killing both the driver and passenger. On the third day of trial, Trooper Elmo Williams was called to the stand and testified that after responding to the accident scene, he accompanied Villalobos to the hospital to conduct a blood draw, at which time he observed Gyokeres draw Villalobos' blood. During a break in the

---

[1] In response to the reading of the witness list, four other venire members disclosed that they knew one of the potential witnesses listed by the court, and all four jurors were stricken.

trooper's testimony, and outside the presence of the other jurors, juror Stelzer revealed to the court and counsel that he knew witness Gyokeres. During the questioning that followed, Stelzer explained that he believed he used to live in the same building as Gyokeres' boyfriend, that Stelzer and Stelzer's wife had known the couple for a few years, they had dinner together a couple of times, and that a few days before the trial, Stelzer's wife attempted to make plans with Gyokeres. In response to further questioning, Stelzer said he did not believe his relationship with Gyokeres would affect his ability to render a fair and impartial decision. Nonetheless, and at the defense's request, the trial court dismissed Stelzer due to his relationship with the witness.

Thereafter, trial resumed with the remainder of Trooper Williams' testimony. During a break at the conclusion of the trooper's testimony, juror Arvidson asked to speak to the court. Outside the presence of the other jurors, Arvidson revealed the following information to the court and counsel:

- Arvidson had been employed by Gyokeres as a carpenter/handyman to perform work on her house at various times over the past four years;

- Arvidson saw Gyokeres around town every three to four months;

- Arvidson performed repair work for Gyokeres approximately two months before the trial;

- Gyokeres paid Arvidson directly, writing him checks for the work performed;

- Arvidson would occasionally run into Gyokeres at the grocery store; and

- The last time Arvidson saw Gyokeres was at the grocery store about two weeks before the trial. At that time Arvidson gave Gyokeres a hug because he knew she was undergoing cancer treatment.

The court, the State and the defense inquired as to Arvidson's ability to be fair and impartial in deciding this case despite Arvidson's relationship with Gyokeres. Arvidson consistently answered that he could be fair and impartial, and that "she's just another person testifying to me."

The defense moved to dismiss Arvidson, contending that despite his claim that he could be impartial, Arvidson was employed by Gyokeres, had social interaction with her, and was sympathetic to Gyokeres' medical condition.[2] The State, on the other hand, believed this situation was different from the prior juror (Stelzer), since Arvidson did not have an ongoing social relationship with Gyokeres, the relationship was limited to some random repair work, and Arvidson would weigh her credibility in the same manner as any other witness. The trial court reasoned as follows:

---

[2] Gyokeres' medical condition and treatment were not relevant to the trial, and no testimony regarding same was elicited during the trial.

4

THE COURT: I agree. Mr. Stelzer indicated that he had a social relationship with that witness, that his wife spoke with her, that they were in more frequent contact on a social basis, that he did offer an opinion about her veracity.

[Arvidson] had indicated no social interaction other than what might occur in a small community, which we are. He did work for her during which their exchange had to do with receiving payment, perhaps talking about a trip she was taking. He ventured no opinion about her trustworthiness or lack of trustworthiness and expressed absolutely no doubt about his ability to weigh her testimony. He did not have any specific knowledge of what her job is or was at the hospital, and what he did venture as what her job may have been is certainly nothing that she was involved with in this incident. And I'm going to allow him to keep his seat.

In announcing its ruling, the court did not determine whether the defense would likely have used a peremptory challenge to strike juror Arvidson had his relationship with Gyokeres been disclosed during voir dire.

Gyokeres was subsequently called to the stand. She testified that although she did not actually remember performing the blood draw, she was the person who drew the blood, that the blood drawn was from Villalobos, and that she followed the correct procedures because she signed off on the paperwork. Her testimony served to establish a chain of custody for the blood sample, and she further testified that Villalobos had a blood alcohol content of .391 on the night of the accident. On cross-examination, the defense sought to impeach Gyokeres, given that she had no independent recollection of the events in question and could not identify Villalobos as the person from whom she drew the blood. The defense also

5

questioned her at length regarding the maintenance of the testing equipment and the handling and chain of custody of the blood test kit.[3]

At the conclusion of the evidence, the defense renewed its objection to juror Arvidson remaining on the jury and moved for a mistrial.[4] The trial court denied the motion, finding that Arvidson's relationship with Gyokeres would not affect the weight or credibility Arvidson gave to Gyokeres' testimony. The jury convicted Villalobos as charged and the court sentenced him to 30 years in state prison. This appeal followed.

We review the trial court's action (in denying the motion to dismiss the juror and for mistrial) for an abuse of discretion. Conde v. State, 860 So. 3d 930, 939 n.6 (Fla. 2003). However, to the extent the claim involves the application of the

---

[3] Testimony at trial indicated that following the blood draw, Trooper Williams turned over the blood samples to a deputy from the Monroe County Sheriff's Office. The deputy testified that, within thirty minutes of receiving the samples, he delivered them to the Monroe County Sheriff's Office evidence room, where they were impounded and refrigerated to preserve the samples for subsequent analysis. However, the defense argued that a property receipt introduced at trial indicated that the blood samples were unaccounted for for nearly thirty hours between the time Trooper Williams turned over the samples to the deputy and the time the deputy delivered them for impounding at the sheriff's office.

[4] It appears from our review of the record that trial began with six jurors and one alternate. After juror Stelzer was dismissed, only six jurors remained on the panel. Had the trial court dismissed juror Arvidson, only five jurors would have remained. Absent an on-the-record waiver and a stipulation to a trial by less than six jurors, see Blair v. State, 698 So. 2d 1210 (Fla. 1997), dismissing juror Arvidson would have necessitated a mistrial.

6

correct law by the trial court in exercising its discretion, our standard of review is *de novo*. Collett v. State, 28 So. 3d 224 (Fla. 2d DCA 2010).

In determining whether juror Arvidson should have continued to serve as a juror in light of his newly-disclosed information, the trial court applied the incorrect standard. The trial court focused its inquiry, and ultimately the exercise of its discretion, on whether there was any reasonable doubt that juror Arvidson could be fair and impartial. Such a standard is to be utilized in determining whether a juror should be stricken "for cause." See Singleton v. State, 783 So. 2d 970 (Fla. 2001); Whitby v. State, 933 So. 2d 557 (Fla. 3d DCA 2006). The trial court instead should have applied the standard for juror nondisclosure, as established in De La Rosa v. Zequeira, 659 So. 2d 239 (Fla. 1995). In De La Rosa, the Supreme Court of Florida outlined the three-prong test to be utilized in determining whether a juror's nondisclosure of information during voir dire warrants a new trial[5]:

> First, the complaining party must establish that the information is relevant and material to jury service in the case. Second, that the juror concealed the information during questioning. Lastly, that the failure to disclose the information was not attributable to the complaining party's lack of diligence.

---

[5] In the more common scenario, the juror's nondisclosure of information is not discovered until after the trial, resulting in a motion for new trial. Here, the nondisclosure was discovered during the trial itself, and the issue is whether the court erred in not dismissing the juror upon discovery of the undisclosed information. Under either scenario, however, the analysis remains the same.

7

Id. at 241.

There is little doubt that the second and third prongs of De La Rosa were

satisfied in this case.[6]  We therefore turn to the first prong and analyze whether the

information was relevant and material.

---

[6] With regard to the concealment prong, the State argues that Arvidson's failure to disclose was not intentional.  However, there is no requirement that the failure to disclose be accompanied by an intent to mislead; even an unintentional failure to disclose satisfies this prong. Bernal v. Lipp, 580 So. 2d 315, 316-17 (Fla. 3d DCA 1991 (finding concealment even though the juror did not intend to mislead counsel).  See also, Estate of Roberts v. Tejada, 814 So. 2d 334 (Fla. 2002)(noting "a juror's non-disclosure need not be intentional to constitute concealment"); Tripp v. State, 874 So. 2d 732 (Fla. 4th DCA 2004). The State also contends that there was no concealment because Arvidson disclosed the information as soon as he became aware that he knew Gyokeres. The case relied upon by the State for this proposition, Murray v. State, 3 So. 3d 1108 (Fla. 2009), is inapposite.  In Murray (unlike the instant case), the juror was never asked during voir dire whether he knew any of the witnesses who would be testifying at trial.  Given that the information was never "squarely asked for," Bernal, 580 So. 2d at 316, it could not be said that the juror in Murray "concealed" any information when, upon realizing he knew one of the witnesses, the juror came forward and notified the court.

We also reject the State's argument that the defense did not act with diligence because it did not inquire further regarding whether any of the jurors knew any of the witnesses who might testify at trial.  During voir dire, the trial court read aloud to the venire the names of each of the witnesses and inquired whether any prospective juror knew the witness.  Neither juror Arvidson nor juror Stelzer indicated at that time that they knew witness Gyokeres.  Where a juror has been asked a clear question and provided an unequivocal response, due diligence does not require further inquiry.  See Dery v. State, 68 So. 3d 252 (Fla. 2d DCA 2010). Here, the jury venire was clearly asked whether any of them knew "Jody Gyokeres from Marathon."  The absence of an affirmative response by Arvidson, indicating that he knew Gyokeres, was in effect an unequivocal "no," and defense counsel's failure to make further inquiry under these circumstances does not constitute a lack of diligence.

8

First, "the complaining party must establish not only that the nondisclosed matter was 'relevant' . . . but also that it is 'material to jury service in the case.'" Estate of Roberts v. Tejada, 814 So. 2d 334, 339 (quoting De La Rosa, 659 So. 2d at 241). Materiality in this context is shown where the "omission of the information prevented counsel from making an informed judgment-which would in all likelihood have resulted in a peremptory challenge." Id. (quoting De La Rosa, 659 So. 2d at 242). A trial court errs when it focuses on whether the juror may be biased or partial when considering or deliberating the case as opposed to "what Appellant's counsel would have done during voir dire had the . . . history been disclosed." Fine v. Shands Teaching Hosp. and Clinics, Inc., 994 So. 2d 426 (Fla. 1st DCA 2008). See also Tripp v. State, 874 So. 2d 732 (Fla. 4th DCA 2004).

Here, Arvidson acknowledged that he had a business relationship with Gyokeres. He performed carpentry/handyman work at Gyokeres' home for which Gyokeres personally wrote him checks, and he performed such work as recently as two months before the trial. According to Arvidson, he and Gyokeres ran into each other every three to four months.

Further, Arvidson described a connection with Gyokeres that was, at least to some degree, not simply a business relationship but a personal one as well: Arvidson had seen Gyokeres at a local grocery store just two weeks before trial.

9

When he saw her at the store, Arvidson was aware that Gyokeres was undergoing cancer treatment and gave her a hug.

We agree with Villalobos that this nondisclosure "prevented counsel from making an informed judgment-which would in all likelihood have resulted in a peremptory challenge." De La Rosa, 659 So. 2d at 242. Had Arvidson disclosed this information during voir dire, we conclude the defense in all likelihood would have exercised a peremptory challenge on juror Arvidson.

Courts have held similarly critical—or even less critical—information to be "material." See De La Rosa, 659 So. 2d at 241 (involvement in prior, completely unrelated lawsuits was material); Dery v. State, 68 So. 3d 252 (Fla. 2d DCA 2010) (holding that juror took an internet course in forensic science several years before trial was material); Mitchell v. State, 458 So. 2d 819 (Fla. 1st DCA 1984) (holding that juror's nephew was a corrections officer at facility where incident occurred was material); Smiley v. McCallister, 451 So. 2d 977 (Fla. 4th DCA 1984) (holding that juror had a son-in-law who was in a car accident was material in a case involving a car accident).

Our determination of materiality is buttressed by the fact that Gyokeres was a significant witness for the State. Aside from being the person who provided evidence that Villalobos had a blood alcohol level of .391 (and thus satisfying an essential element of the State's case), Gyokeres drew Villalobos' blood, testified

10

that the blood was correctly drawn, that the chain of custody was uninterrupted, and that the hospital's equipment was functioning properly. Defense counsel assertively questioned, and sought to impeach, Gyokeres on these issues and on her apparent lack of ability to recall important aspects of her involvement in this case. Under these circumstances, had the defense been made aware during voir dire of the information regarding the relationship between juror Arvidson and witness Gyokeres, the defense in all likelihood would have peremptorily challenged Arvidson.[7]

Because the trial court erred in denying the motion to dismiss juror Arvidson, and in denying the subsequent motion for mistrial, we reverse and remand for a new trial.

---

[7] Although the State contends that the trial court correctly determined that Arvidson could still be fair and impartial notwithstanding his knowledge of and relationship with Gyokeres, such a determination could not serve to satisfy the requisite assessment of materiality under De La Rosa. The relevant question is not whether there was a reasonable doubt about Arvidson's ability to be fair and impartial (an analysis that focuses largely on the trial court's assessment of the candor, demeanor and certainty of the juror's answers), but whether the defense in all likelihood would have exercised a peremptory challenge had this information been disclosed during voir dire (an analysis that focuses largely on the trial court's assessment of the reasonable and probable actions counsel would have taken in the collective light of a complete and informed jury selection process). One cannot reasonably ignore the defense's legitimate concerns, for example, that Arvidson might accord greater weight or credibility to Gyokeres' testimony than would a typical juror; that Arvidson might be disproportionately affected by the aggressive manner of the cross-examination of Gyokeres; and that Arvidson might share with fellow jurors his knowledge of Gyokeres' medical condition and treatment.