736 So.2d 1156 (1999)
Allen Lee DAVIS, Appellant,
v.
STATE of Florida, Appellee.
No. 93,816.
Supreme Court of Florida.
June 3, 1999.
*1157 John W. Moser, Capital Collateral Regional Counsel, Harry P. Brody, John P. Abatecola and Jeffrey M. Hazen, Office of the Capital Collateral Regional Counsel Middle Region, Tampa, Florida, for Appellant.
Robert A Butterworth, Attorney General, and Curtis M. French, Assistant Attorney General, Tallahassee, Florida, for Appellee.
PER CURIAM.
Allen Lee Davis, a prisoner under sentence of death, appeals a trial court order denying his third motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.850. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm.

I. Background
Allen Lee "Tiny" Davis was convicted and sentenced to death for the May 11, 1982, murders of Nancy Weiler and her two minor daughters, Kristina and Katherine, in their Jacksonville home. This Court affirmed each conviction and death sentence. Davis v. State, 461 So.2d 67 (Fla.1984), cert. denied, 473 U.S. 913, 105 S.Ct. 3540, 87 L.Ed.2d 663 (1985). For a detailed history of Davis's postconviction filings and the disposition thereof, see Davis v. Singletary, 853 F.Supp. 1492, 1506-11 (M.D.Fla.1994), affirmed, 119 F.3d 1471 (11th Cir.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 1848, 140 L.Ed.2d 1097 (1998).
Davis filed his third 3.850 motion in April 1998. The trial court's order denying this motion is currently before the Court. Davis's motion raises a claim of newly discovered evidence regarding the trial testimony of Donald Havekost, an Federal Bureau of Investigation (FBI) analyst. This claim stems from a report released in 1997 by the Department of Justice Office of the Inspector General (OIG) concerning an internal investigation into allegations of wrongdoing and improper practices within certain sections of the FBI Laboratory. In this report, the OIG mentions Havekost in connection with the work of another FBI analyst in an unrelated case. Pointing to the report's reference to Havekost, Davis asserts that evidence may exist which would prove Havekost's trial testimony to be unreliable, misleading, and false. Based on this speculation that evidence may exist, Davis moved the court for additional time to review a plethora of documents received from the Department of Justice through a Freedom of *1158 Information Act request. See § 5 U.S.C. 552 (1994 & supp.1996).
The trial court rejected this claim, concluding that Davis failed to allege a sufficient factual basis upon which to challenge Havekost's trial testimony and that the report upon which Davis relied actually refuted his claim by implication. With respect to the second portion of the court's ruling, the court found that although the OIG investigated several individual analysts, the report did not conclude that Havekost engaged in any improper conduct. The court also noted that the OIG did not investigate the Elemental Analysis Unit, the unit in which Havekost worked at the time he testified in Davis's trial. The trial court order reads in pertinent part:
[T]his Court will note that a review of [Davis's] motion, and the report upon which he bases his claim, demonstrates that the ... claim is not only facially insufficient, it constitutes nothing more than a fishing expedition....
Dr. Frederic Whitehurst, Ph.D. (Whitehurst), was the supervising analyst in the Explosives Unit (EU) of the F.B.I.'s crime laboratory. Over a period of approximately ten years, Whitehurst made several complaints about activities within the EU, most of which were regarding his supervisor, Dr. Terry Rudolph, who was the supervising analyst of the EU prior to Whitehurst's assumption of that position. As a result of Whitehurst making his complaints public, the Department of Justice (D.O.J.) directed the Office of the Inspector General (O.I.G.) to conduct a full investigation into all claims regarding the crime laboratory. The O.I.G. enlisted the aid of five scientists of international reputation in conducting its investigation. The O.I.G. not only investigated all of Whitehurst's allegations, they investigated all of the allegations raised by other analysts within the F.B.I. crime lab that were raised during the course of its investigation. The O.I.G. reviewed approximately 60,000 pages of documents in the course of its investigation. The allegations dated as far back as 1981 (one of the Unabomber cases). The allegations related primarily to three analysis units within the crime lab: the Explosives Unit (EU), the Materials Analysis Unit (MAU), and the Chemistry-Toxicology Unit (CTU). Allegations that were made regarding analysts outside of those three units are described as specific cases within the report. The report demonstrates that the majority of the complaints made were in regard to the actions of individual analysts in particular cases and not to the general analytical procedures used....
There are two main factors about the report that demonstrate that the report not only fails to support [Davis's] claim that Analyst Donald Havekost's (Havekost) testimony was "unreliable, misleading and false," it actually refutes that claim (by logical deduction). The first factor is the fact that Havekost is not the subject of a single complaint raised by any of the analysts. Indeed, of the 517 pages of the report, Havekost is mentioned in only three of those pagesas the analyst who performed an analysis which was the precursor of an analysis performed by another analyst (in another analysis unit) who was the subject of a complaint.
The second factor, is that Havekost was not a member of the three principle analysis units that were the subjects of the complaints (the EU, MAU, and CTU). The report shows that Havekost was a member of the Elements and Metals Analysis Unit (EMAU). Further, the Report shows that the Elements and Metals Analysis Unit (EMAU) was not merged into the Materials Analysis Unit (MAU) until sometime in 1993-1994.

II. Discussion
To be entitled to an evidentiary hearing on a newly discovered evidence claim, Davis must, in addition to satisfying *1159 the due diligence requirement of rule 3.850(b), allege that he has discovered evidence which is "of such nature that it would probably produce an acquittal on retrial." Williamson v. Dugger, 651 So.2d 84, 89 (Fla.1994) (quoting Jones v. State, 591 So.2d 911, 915 (Fla.1991)). We find that Davis's allegations concerning Havekost's testimony are based, at best, on tenuous speculation and as such do not constitute newly discovered evidence. Moreover, we agree with the trial court that there is no basis at this time to allow this legally insufficient motion to go forward.[1]
In April 1997, the Department of Justice released a report, Office of the Inspector General, U.S. Dep't of Justice, The FBI Laboratory: An Investigation into Laboratory Practices and Alleged Misconduct in Explosives-Related and Other Cases (1997) (hereinafter OIG Report). In this report, the OIG details its findings regarding an extensive investigation lasting more than eighteen months into allegations of wrongdoing and improper practices within certain sections of the FBI Laboratory. OIG Report at 1. According to the report's executive summary, the impetus for the investigation was allegations made by Supervisory Special Agent Frederic Whitehurst, a Ph.D., a scientist employed at the laboratory. Id. The investigation focused on three specific units: the Explosives Unit, the Materials Analysis Unit, and the Chemistry-Toxicology Unit. Id.
The OIG also reviewed individual cases. One such case was that of George Trepal, who was found guilty in Florida on one count of first-degree murder and six counts of attempted murder as a result of his adding the poison thallium nitrate to bottled Coca-Cola. See id. at 392-99. Whitehurst had written the OIG about FBI Special Agent Roger Martz, who testified at Trepal's trial. As a result, the OIG scrutinized Martz' work in Trepal's case and subsequently detailed its findings in the report. State officials delivered to the FBI Crime Laboratory several Coca-Cola bottles for contamination testing. Donald Havekost of the Elemental Analysis Unit first examined these bottles and determined that they contained thallium nitrate. After Havekost made this determination, the bottles were forwarded to Martz, a member of a separate unit, for determination of the form in which the thallium nitrate was present. The OIG then made certain conclusions with respect to the work performed by Martz.
We see nothing in this report that challenges Havekost's veracity as a trial witness or the scientific methodology underlying the basis for his expert opinion. The report clearly states that the OIG investigated not only Whitehurst's allegations but also "problems that we [the OIG] ourselves identified in the course of our investigation, as well as information brought to our attention by other employees in the Laboratory." OIG Report at 1. In part five, section I of this report, entitled "FINDINGS AND RECOMMENDATIONS CONCERNING INDIVIDUALS," the OIG discusses persons directly challenged by Whitehurst and "other individuals whose conduct ... merits critical comment." Id. at 443. Havekost is not mentioned in this section.
Accordingly, we affirm the trial court's denial of Davis's third motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.850.
It is so ordered.
*1160 SHAW, WELLS, ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.
HARDING, C.J., recused.
NOTES
[1] Davis also argues that the trial court erred in failing to hold a hearing where his lawyers could argue the legal merits of the motion. See Fla. R.Crim. P. 3.850(c); Huff v. State, 622 So.2d 982 (Fla.1993). In view of the fact that the instant motion is successive and legally insufficient on its face, we find this error harmless. See Groover v. State, 703 So.2d 1035, 1038 (Fla.1997) ("[E]ven if a Huff hearing had been required in the instant case, the court's failure to do so would be harmless as no evidentiary hearing was required and relief was not warranted on the motion.").