# Supreme Court of Florida

_____

No. SC18-520
_____

**STEVEN RICHARD TAYLOR,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

December 20, 2018

PER CURIAM.

This case is before the Court on appeal from an order denying a second successive motion to vacate a judgment of conviction of first-degree murder and a sentence of death under Florida Rule of Criminal Procedure 3.851. Because the order concerns postconviction relief from a capital conviction for which a sentence of death was imposed, this Court has jurisdiction under article V, section 3(b)(1) of the Florida Constitution.

## FACTS AND BACKGROUND

Steven Richard Taylor was convicted of first-degree murder, burglary of a dwelling, and sexual battery and was sentenced, among other sentences, to death.

*Taylor v. State* (*Taylor I*), 630 So. 2d 1038, 1039 (Fla. 1993). In affirming his

convictions and sentences on direct appeal, we set forth the pertinent facts

pertaining to Taylor's case:

> The record reflects that on September 15, 1990, at about 11:30 p.m., the victim, fifty-nine-year-old Alice Vest, returned to her mobile home in Jacksonville after spending the evening with a friend. Earlier that evening, the appellant, Steven Richard Taylor, and two friends were out driving and listening to the radio. Around midnight, the driver of the car dropped off Taylor and his friend, who was later to become his accomplice, near the victim's neighborhood.
>
> Sometime in the early morning hours of September 16, a Ford Ranchero was stolen from a residence near the place where Taylor had been dropped off. At about 4:30 a.m., after the vehicle had been stolen, a passing motorist noticed the Ford Ranchero parked in a driveway next door to the mobile home where the victim lived. Later that morning, the Ford Ranchero was found abandoned behind a used car dealership only a few blocks from where Taylor lived at the time.
>
> On the same morning, neighbors discovered the victim's battered body in the bedroom of her mobile home. The medical examiner testified that the victim had been stabbed approximately twenty times, strangled, and sexually assaulted. The medical examiner further testified that most of the stab wounds were made with a knife found at the scene of the crime, while the remaining stab wounds were made with a pair of scissors that were also found at the scene. The medical examiner stated that the victim was alive while she was being stabbed, that she was strangled with an electrical cord, and that the strangulation had occurred after the victim was stabbed.
>
> The medical examiner also testified that the victim's lower jaw had multiple fractures and that she had received several blows to her head. The examiner testified that the fractures of the victim's jaw could have resulted from being struck with a broken bottle found on the bed next to the victim, and that contusions to the victim's head were consistent with being struck by a metal bar and candlestick also found at the scene. Finally, the medical examiner testified that the victim's breasts were bruised, and that the bruises resulted from "impacting, sucking, or squeezing" while she was alive. In the medical examiner's opinion, the victim was alive at most ten minutes

from the first stabbing to the strangulation. On cross-examination, the examiner stated that he did not know whether the victim was conscious during all or any part of the attack.

The testimony at trial also revealed that the phone line to the mobile home had been cut, that the home had been burglarized, and that various pieces of jewelry were missing.

In December of 1990, Taylor moved out of the duplex he had been sharing with a friend. In January, 1991, while Taylor's former roommate was removing a fence behind the duplex, he discovered a small plastic bag buried in the ground near the fence. The bag contained the pieces of jewelry taken from the victim's home during the attack and burglary. The roommate turned the jewelry over to the police and gave a statement. Later that month, Taylor visited the duplex with some friends. The former roommate testified that, at some point during the visit, Taylor went into the backyard and stared at the place where the fence had stood. During the following month, Taylor again returned to the duplex with friends. One of the accompanying friends testified that Taylor went into the backyard and returned a few minutes later with dirty hands. In response to the friend's inquiry as to what he was doing, Taylor allegedly responded that he had left some things there and that they were gone.

On February 14, 1991, the Duval County sheriff's office executed a search warrant on Taylor which authorized the officers to take blood, saliva, and hair samples from Taylor. Taylor was taken to the nurses' station at the county jail so that the samples could be taken, but not before Taylor invoked his right to counsel. Later that day, after the samples were taken, Taylor asked the investigating officer how long it would take to get the results back. Instead of directly responding to the question, the investigating officer asked Taylor why he wanted to know. Taylor responded that he was just wondering when they would be back out to pick him up. Taylor did not have long to wait. Two days later, on February 16, Taylor was arrested, and, on March 3, a grand jury returned a two-count indictment against Taylor for first-degree murder and burglary. The indictment was amended on September 12, 1991, to add a third count for sexual battery.

At trial, the State presented the testimony of Timothy Cowart, who had shared a cell with Taylor in the Duval County jail. Cowart testified that, in a jailhouse conversation with Taylor in early April, Taylor stated that he had been involved in a burglary and that it was a

messy job; that the lady surprised him inside the trailer; and that he stabbed her and choked her and then strangled her with a cord to make sure she was dead. Cowart also testified that Taylor said the State could place him, but not his accomplice, at the scene of the crime, and that the State could convict him with the evidence it had. Taylor allegedly asked Cowart to hide a gun and handcuff key in the bathroom at the hospital; Taylor would then feign an illness, get taken to the hospital, and have a chance to escape.

A Florida Department of Law Enforcement lab analyst, who was an expert in serology, testified that semen found on a bed covering and on a vaginal swab taken from the victim could not be tested. However, the analyst testified that semen found in the victim's blouse matched Taylor's DNA profile.

In the guilt phase, Taylor presented only one witness, an agent of the Federal Bureau of Investigation. The agent testified that certain hairs found on the victim's body and clothing matched the pubic hairs of Taylor's accomplice. On cross-examination, the agent conceded that it is possible to commit a sexual battery and not leave any fibers or hair. Taylor then rested his case and the jury found him guilty as charged.

At the penalty phase proceeding, the State rested without presenting any additional evidence. Taylor presented the testimony of five witnesses. First, Taylor called Charles Miles, who lived next door to Taylor during Taylor's adolescence. Miles stated that Taylor frequently played with Miles' son and that Taylor was always very polite and respectful. Miles testified that on one occasion he and Taylor sat in Miles' garage and talked at length about religion. Taylor's next witness was Lloyd King, his uncle. King testified that Taylor had always been a polite person. The third witness, Judy Rogers, was a friend of the family who testified that she thought Taylor had a learning disability. Taylor's next witness was another uncle, Don King, who testified that, during fifth and sixth grades, Taylor experienced difficulty in reading and that his reading comprehension was poor. King also stated that Taylor was a very passive person. As his last witness, Taylor called his adoptive mother, Lenette Taylor, who testified that Taylor had experienced difficulty concentrating in school and that she had tried unsuccessfully to get him into special education classes. She testified that Taylor's I.Q. had been tested and found to be around 68 to 70, which, according to her, is in the mildly retarded range. On cross-examination, she

acknowledged that, in 1979, when he was nine years old, Taylor had tested in a normal intellectual range. The record further reflects that, although defense counsel had Taylor examined by two mental health experts, counsel found it to be in Taylor's best interest not to present the experts' testimony at trial. As an additional mitigating factor, Taylor offered evidence that he was only twenty years old at the time of the murder.

The jury recommended the death sentence by a vote of ten to two. In sentencing Taylor to death, the trial judge found the following aggravating factors: (1) the murder was committed during the course of a burglary and/or sexual battery; (2) the murder was committed for financial gain; and (3) the murder was committed in an especially heinous, atrocious, or cruel manner. As the sole nonstatutory mitigating factor, the trial judge found that Taylor was mildly retarded. The trial judge sentenced Taylor to death for the first-degree murder, to fifteen years' imprisonment for the burglary, and to twenty-seven years' imprisonment for the sexual battery.

*Id.* at 1039-41. On October 3, 1994, the United States Supreme Court denied Taylor's petition for writ of certiorari. *Taylor v. Florida*, 513 U.S. 832 (1994). Thus, Taylor's conviction and sentence of death became final on that date.

We affirmed the denial of Taylor's initial motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.850 and denied his petition for writ of habeas corpus. *Taylor v. State* (*Taylor II*), 62 So. 3d 1101, 1106 (Fla. 2011). After the release of *Hurst v. Florida*, 136 S. Ct. 616 (2016), and *Hurst v. State*, 202 So. 3d 40 (Fla. 2016), *cert. denied*, 137 S. Ct. 2161 (2017), Taylor filed his first successive motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.851, and we affirmed the postconviction court's denial of relief. *Taylor v. State* (*Taylor III*), 234 So. 3d 649, 650 (Fla. 2018).

- 5 -

Taylor then filed this second successive motion for postconviction relief pursuant to rule 3.851, alleging newly discovered evidence in the form of an exculpatory affidavit of a witness and new DNA evidence. Without conducting a case management conference, the postconviction court denied Taylor's motion. This appeal follows.

**ANALYSIS**

Taylor raises two claims in his appeal to this Court. First, Taylor asserts that the postconviction court's failure to hold a case management hearing, known as a *Huff*[1] hearing, violated his due process rights. Second, Taylor contends that, on the merits, the postconviction court erred in summarily denying his second successive postconviction motion. All of these claims are addressed individually below.

I.

In his first claim, Taylor contends that the postconviction court violated his due process rights by failing to hold a case management conference, pursuant to *Huff*, before ruling on his second successive motion for postconviction relief. In accordance with our extensive precedent on the failure to hold *Huff* hearings for successive motions for postconviction relief, we conclude that any error here was harmless.

---

1. *Huff v. State*, 622 So. 2d 982 (Fla. 1993).

- 6 -

In *Huff*, we stated:

> Because of the severity of punishment at issue in a death penalty postconviction case, we have determined that henceforth the judge must allow the attorneys the opportunity to appear before the court and be heard on an initial 3.850 motion. This does not mean that the judge must conduct an evidentiary hearing in all death penalty postconviction cases. Instead, the hearing before the judge is for the purpose of determining whether an evidentiary hearing is required and to hear legal argument relating to the motion.

622 So. 2d at 983. This *Huff* hearing requirement was later expanded to include rule 3.851 motions. *See* Fla. R. Crim. P. 3.851(f)(5)(B).

Nevertheless, in *Groover v. State*, 703 So. 2d 1035 (Fla. 1997), we elaborated that our holding in *Huff* was limited to *initial* death penalty postconviction motions. *Id.* at 1038. We noted that although *Huff* hearings are preferred in order to allow the parties to present their legal arguments, one was not required in Groover's case because his successive postconviction motion was without merit. *Id.* "[E]ven if a *Huff* hearing had been required in [*Groover*], the court's failure to do so would be harmless as no evidentiary hearing was required and relief was not warranted on the motion." *Id.* Moreover, we have repeatedly upheld our holding in *Groover* with regard to *Huff* hearings on legally insufficient or meritless successive postconviction motions. *See Marek v. State*, 14 So. 3d 985, 999 (Fla. 2009) (holding that the failure to hold a *Huff* hearing on Marek's fourth successive postconviction motion that was legally insufficient on its face and without merit was harmless and stating that "[t]he failure to hold a hearing on a

successive postconviction motion that is legally insufficient on its face is harmless error" (citing *Davis v. State*, 736 So. 2d 1156, 1159 n.1 (Fla. 1999); *Groover*, 703 So. 2d at 1038)); *Davis*, 736 So. 2d at 1159 n.1 ("In view of the fact that the instant motion is successive and legally insufficient on its face, we find this error harmless." (citing *Groover*, 703 So. 2d at 1038)); *see also Mordenti v. State*, 711 So. 2d 30, 32 (Fla. 1998) (holding a failure to hold a *Huff* hearing on Groover's *fourth* successive postconviction motion was harmless error whereas the same lack of *Huff* hearing on Mordenti's *first* motion for postconviction relief was not). Therefore, we have repeatedly emphasized that the failure to hold a *Huff* hearing on legally insufficient or meritless successive postconviction motions is harmless error.

Here, the postconviction motion at issue is Taylor's *second successive* postconviction motion. Moreover, as discussed at length below, the postconviction court below properly found that Taylor's successive postconviction motion was without merit. Therefore, although *Huff* hearings are preferred on all postconviction motions, we conclude that the failure to hold a case management hearing in the instant proceeding was harmless. *See, e.g.*, *Groover*, 703 So. 2d at 1038. Thus, this claim of Taylor's successive motion for postconviction relief fails.

II.

Taylor next asserts that the postconviction court erred in summarily denying his newly discovered evidence claims. Taylor presents two items of newly discovered evidence, both of which the postconviction court deemed to be meritless: (1) an affidavit from James Dixon, and (2) new DNA evidence. Each piece of newly discovered evidence is addressed individually below.

A. Standard of Review

We originally enunciated the standard of review governing claims of newly discovered evidence in *Jones v. State*, 709 So. 2d 512 (Fla. 1998). In sum,

> [t]o obtain a new trial based on newly discovered evidence, a defendant must meet two requirements. First, the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence. Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial. *See Jones*, 709 So. 2d at 521. Newly discovered evidence satisfies the second prong of the *Jones* test if it "weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability." *Jones*, 709 So. 2d at 526 (quoting *Jones v. State*, 678 So. 2d 309, 315 (Fla. 1996)). If the defendant is seeking to vacate a sentence, the second prong requires that the newly discovered evidence would probably yield a less severe sentence. *See Jones v. State*, 591 So. 2d 911, 915 (Fla. 1991).
>
> In determining whether the evidence compels a new trial, the trial court must "consider all newly discovered evidence which would be admissible" and must "evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial." *Id.* at 916. This determination includes
>
> > whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence. The trial

> court should also determine whether the evidence is cumulative to other evidence in the case. The trial court should further consider the materiality and relevance of the evidence and any inconsistencies in the newly discovered evidence.

*Jones*, 709 So. 2d at 521 (citations omitted).

*Preston v. State*, 970 So. 2d 789, 797-98 (Fla. 2007) (alterations in original).

Furthermore, "[t]he summary denial of a newly discovered evidence claim will be upheld if the motion is legally insufficient or its allegations are conclusively refuted by the record." *Taylor v. State*, 3 So. 3d 986, 999 (Fla. 2009) (citing *McLin v. State*, 827 So. 2d 948, 954 (Fla. 2002)). "To support a summary denial without a hearing, a trial court must either state its rationale in its decision or attach those specific parts of the record that refute each claim presented in the motion." *Anderson v. State*, 627 So. 2d 1170, 1171 (Fla. 1993). Where no evidentiary hearing is held, this Court has delineated that it must accept the defendant's factual allegations, "to the extent they are not refuted by the record." *Foster v. State*, 810 So. 2d 910, 914 (Fla. 2002) (quoting *Peede v. State*, 748 So. 2d 253, 257 (Fla. 1999)).[2] However, we have nonetheless stated that "there may be cases where, from the face of the affidavit, it can be determined that the affidavit is 'inherently

_____

2. In addition, with regard to successive postconviction motions under rule 3.851(f)(5)(B), "[i]f the motion, files, and records in the case conclusively show that the movant is entitled to no relief, the motion may be denied without an evidentiary hearing." Fla. R. Crim. P. 3.851(f)(5)(B).

- 10 -

incredible,' " which may ultimately warrant summary denial.  *McLin*, 827 So. 2d at

955 (quoting *Robinson v. State*, 736 So. 2d 93, 93 (Fla. 4th DCA 1999)).

Moreover, we have also indicated that "there may be cases where the newly

discovered evidence is 'obviously immaterial' to the verdict," which might also

warrant summary denial.  *Id.* at 956 (quoting *Robinson*, 736 So. 2d at 93).

In addition, this Court has emphasized the need for a cumulative analysis

when determining the validity of a newly discovered evidence claim:

> Based on the standard set forth in *Jones*[], the postconviction court must consider the effect of the newly discovered evidence, in addition to all of the admissible evidence that could be introduced at a new trial.  *Swafford v. State*, 125 So. 3d 760, 775-76 (Fla. 2013).  In determining the impact of the newly discovered evidence, the court must conduct a cumulative analysis of all the evidence so that there is a "total picture" of the case and "all the circumstances of the case." *Id.* at 776 (quoting *Lightbourne v. State*, 742 So. 2d 238, 247 (Fla. 1999)). . . . As this Court held in *Lightbourne*, and more recently in *Swafford*, a postconviction court must even consider testimony that was previously excluded as procedurally barred or presented in another postconviction proceeding in determining if there is a probability of an acquittal.  *Swafford*, 125 So. 3d at 775-76; *Lightbourne*, 742 So. 2d at 247; *see also Roberts v. State*, 840 So. 2d 962, 972 (Fla. 2002) (holding that upon remand, if the trial court determined that the testimony in a newly discovered evidence claim was reliable, the trial court was required to review that new evidence, as well as claims under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963), that were previously rejected in a prior postconviction motion, because the evidence was equally accessible to the defense and there was no reasonable probability that the result of the trial would have been different had the evidence been disclosed).

*Hildwin v. State*, 141 So. 3d 1178, 1184 (Fla. 2014).

## B. Newly Discovered Affidavit Evidence

Taylor first asserts that an allegedly exculpatory affidavit by Dixon constitutes newly discovered evidence that warrants relief. Dixon's affidavit, in full, states:

> I, James Dixon worked for Walter Holton in the early 90's doing odd jobs. Holton sold large amounts of cocaine with a Cuban Friend from Miami, who drove a Porsche. Both men were dangerous if you crossed them and were known to put contract hits out on people who crossed them. I was questioned by Police about a sailboat necklace that was possibly connected to a homicide. I got the sailboat necklace from Angela Smith, who was the girlfriend of Walter Holton at the time. She told me that she got it from his Cuban friend, who told her to "never get rid of it". [sic] I did not tell the police where I got the necklace from, because I was afraid of Walter Holton and his Cuban friend. My DNA was collected by the police and I was cleared of any involvement with the homicide case.

Taylor supplements the information contained within Dixon's sworn affidavit with a number of additional facts he claims to have obtained from Dixon himself. The postconviction court below summarized these additional facts to the following:

> Defendant claims Dixon knows Mr. Holton murdered Ms. Vest because Dixon allegedly said "Mr. Holton admitted he murdered Ms. Vest because she threatened him after one of her friends had a drug-related conflict with Mr. Holton." Defendant maintains Dixon's alleged conclusion that Holton, not Defendant, murdered Ms. Vest is supported by Dixon's alleged statements that (1) Angela Smith lied to police when she provided an alibi for Holton when Dixon "was selling cocaine for Mr. Holton that night and knew Holton was not with Ms. Smith"; (2) he knows Holton's [Ford Ranchero] was damaged after hitting a mailbox "belonging to a house they robbed"; and (3) he gave the sailboat necklace to someone "who later pawned it." According to Defendant, Dixon said he came forward at this time because Holton, who had "put a hit out" on Dixon, has died.

- 12 -

(Citation omitted.)

In denying this claim of Taylor's successive postconviction motion, the postconviction court noted that Dixon's affidavit relies on inferences stacked upon inferences in order to establish the likelihood of acquittal on retrial. Additionally, the postconviction court noted that there is no definitive statement within the affidavit that anyone other than Taylor murdered Ms. Vest. Finally, the postconviction court found that Taylor's assertion that Dixon murdered Ms. Vest or was present during the murder of Ms. Vest did not constitute newly discovered evidence because this evidence was available at trial and defense counsel could have found it through due diligence prior to trial.

The first prong of the *Jones* test requires that the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and the defendant or defense counsel could not have known of it by the use of diligence. *Jones*, 709 So. 2d at 521. We agree with the postconviction court that evidence indicating Dixon was a possible suspect in the murder of Ms. Vest was available to the defense before trial, based on Dixon's own assertion that his DNA was taken during the police investigation and he was excluded as a possible suspect. However, with regard to Holton's possible involvement in the murder, we conclude that this evidence was previously unavailable to Taylor, based on Dixon's previous unwillingness to testify.

The second prong of the *Jones* test requires that the newly discovered evidence be of such a nature that it would probably produce an acquittal on retrial. *Id.* In assessing this prong, we consider "whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence . . . whether the evidence is cumulative to other evidence in the case . . . the materiality and relevance of the evidence and any inconsistencies in the newly discovered evidence." *Id.* For the reasons discussed below, we conclude that Taylor's claim fails on the second prong of the *Jones* analysis because Dixon's affidavit would probably not produce an acquittal on retrial.

First, the postconviction court was correct in determining that Dixon's affidavit would not produce an acquittal for Taylor on retrial because the information within the affidavit, even if true, presents a theory of the case— namely, that another individual, not Taylor, murdered Ms. Vest—that is cumulative to that already presented by the defense at trial. Specifically, Taylor's entire defense at trial was that his codefendant, Murray, committed the murder, based upon the testimony of FBI Special Agent Joseph A. Dizinno, an expert in hair and fiber analysis, which linked hairs found on the victim and at the scene of the crime to Murray, but not Taylor. Because Agent Dizinno could not match any of the hairs found on the victim or at the scene of the crime to Taylor, the defense argued that he was not the perpetrator. As evidenced by the guilty convictions on

each of the charged crimes, the theory of an alternative murderer was rejected by the jury. Thus, attempting to present up to three additional suspects (i.e., Walter Holton, the "Cuban friend," or Angela Smith) would have been cumulative and would probably not produce an acquittal on retrial.

Second, the postconviction court was correct in finding that the Dixon affidavit would not produce an acquittal on retrial based on the fact that the evidence in the trial record clearly and directly refutes the claims made by Dixon in his affidavit with regard to who the true perpetrator was, thus indicating the inherent unreliability of the information contained within the affidavit. *See Foster*, 810 So. 2d at 914 (holding that the Court must accept the defendant's factual allegations "*to the extent they are not refuted by the record*" (emphasis added) (citing *Peede*, 748 So. 2d at 257)). Specifically, the information Dixon now presents is directly refuted by the following portions of the trial record: (1) testimony from Dr. James M. Pollock, Jr. matching semen recovered from a blouse found at the scene of the crime to Taylor's DNA profile; (2) testimony from Johnny Allen Taylor[3] and Jason Leister indicating that Taylor, on two different occasions, went into the backyard of his old residence looking for items in the area

---

3. Johnny Allen Taylor is unrelated to the defendant in this case. Johnny Taylor's connection to the defendant is that he and the defendant lived together at the time of the murder. In the interest of clarity, Johnny Taylor will be referred to as such, and the defendant will be referred to as Taylor.

where Ms. Vest's jewelry was found; (3) evidence and testimony from Detective T. C. O'Steen that the sailboat necklace, along with multiple other pieces of jewelry identified as belonging to the victim, was found buried in the backyard of Taylor's old residence; and (4) testimony from Detective John Robert Bogers and Timothy Dale Cowart about inculpatory statements made by Taylor. Each of these items will be individually addressed in more detail below.

1.  Semen Match

Dr. Pollock, an expert in forensic serology and DNA analysis, testified at trial that he received a number of items for testing in connection with this case: (1) a stain from a bedspread; (2) a stain from a blouse; (3) a blood sample from Ms. Vest; (4) a vaginal swab from Ms. Vest; and (5) a liquid blood sample from Taylor. Dr. Pollock explained that the DNA samples from the bedspread and Ms. Vest's vaginal swab were too degraded to perform proper DNA analyses. Dr. Pollock was, however, able to perform DNA testing on the stain from the blouse recovered at the scene of the crime. Through this testing, Dr. Pollock found that the DNA recovered from the blouse stain matched the DNA profile from Taylor's blood sample. In so finding, Dr. Pollock testified that the probability of selecting an unrelated individual from the overall gene population having the same DNA profile was one in six million, which he further narrowed down to a probability of one in twenty-three million, when looking only at the Caucasian database.

We conclude that Dr. Pollock's testimony matching DNA recovered from a stained blouse found at the crime scene to that of Taylor's DNA profile directly refutes Taylor's current claim that Dixon's affidavit is so exculpatory that it would produce an acquittal on retrial. Contrary to what Taylor now attempts to assert, none of the information contained within Dixon's affidavit refutes or explains the scientific DNA evidence linking Taylor to the place where Ms. Vest was murdered. Therefore, we conclude that the likelihood that Dixon's affidavit would produce an acquittal on retrial, in light of the DNA evidence linking Taylor to the crime scene, is very slim.

## 2. The Sailboat Necklace

Taylor's roommate during the time that Ms. Vest was murdered, Johnny Taylor, testified that he and Taylor lived together in September of 1990, and that Taylor moved out sometime before Christmas of 1990. Johnny Taylor further testified that in January 1991, after Taylor moved out, he and his brother renovated the fencing in the backyard of their split duplex. Approximately a week after redoing the fence, Johnny Taylor testified that his dogs dug up a sandwich bag containing jewelry from an area of the backyard bordering the duplex.[4] At trial,

---

4. Linda Engler, a longtime friend of Ms. Vest who saw her multiple times a week, testified at trial that Ms. Vest regularly wore a gold coin on a chain, that Ms. Vest was wearing gold earrings the day before she was murdered, and that Ms. Vest often wore a "ship pendant." Further, Engler identified photographs depicting the gold coin, ship pendant, gold earring, and gold chains as those belonging to

- 17 -

Johnny Taylor testified that the sandwich bag contained two necklaces, a coin, and an earring.[5] Johnny Taylor turned these items over to Detective O'Steen and gave a sworn statement. Johnny Taylor testified that, approximately two days after he gave his sworn statement, Taylor came over with two other individuals. While the others sat at the kitchen table drinking beers, Taylor went into the backyard for a minute or two and then returned to the table, where he explained that he was looking at the new fence. Taylor and the two other individuals left shortly thereafter.

Next, Jason Leister testified that, around February 1991, he went to Johnny Taylor's house with Taylor and another individual. While there, Leister testified that Taylor went out to the backyard and returned with dirty hands that he proceeded to wash. Leister testified that, when asked what he was doing, Taylor responded "that he left some things over there and they were gone."

---

Ms. Vest. In addition, Engler identified items of evidence as the gold coin, the ship pendant, the earring, and two gold chains that she had previously identified as belonging to Ms. Vest.

5. Johnny Taylor identified the same items of evidence previously described by Engler to be those belonging to Ms. Vest as being the items he found contained within the sandwich bag in his backyard. Specifically, the items of evidence Johnny Taylor identified were a coin, an earring, a ship pendant, and two gold chains.

Finally, Detective O'Steen testified that, in February 1991, he visited Johnny Taylor's duplex, where he recovered a gold coin, a sailboat pendant, a gold earring, and two gold chains. Detective O'Steen identified each of the five pieces of jewelry admitted into evidence as those he recovered from Johnny Taylor. In addition, Detective O'Steen testified that he obtained all five pieces of jewelry from Johnny Taylor and his brother.

We conclude that the information within the Dixon affidavit concerning the ship pendant is directly contradicted by the testimony presented at trial. Specifically, Detective O'Steen's testimony that he recovered the sailboat pendant directly from Johnny Taylor and his brother contradicts Dixon's statement that he had possession of the sailboat necklace, which he obtained from Angela Smith and later gave to another individual to pawn. *See Foster*, 810 So. 2d at 914 (holding that the Court must accept the defendant's factual allegations "*to the extent they are not refuted by the record*" (emphasis added) (citing *Peede*, 748 So. 2d at 257)). The trial record directly refutes Dixon's affidavit, thus indicating its inherent incredibility. Therefore, we conclude that the postconviction court was correct in summarily denying this newly discovered evidence claim because "the motion, files, and records . . . conclusively show that [Taylor] is entitled to no relief" on their face. Fla. R. Crim. P. 3.851(f)(5)(B). Furthermore, the statements contained within the affidavit would not produce an acquittal on retrial.

### 3. Taylor's Inculpatory Statements

Detective John Robert Bogers testified at trial that in the course of taking Taylor's blood, saliva, and hair samples pursuant to a search warrant, Taylor asked how long it would take for the results of the samples to come back. When Detective Bogers asked why, Taylor "stated he was just wondering when we would be back out to pick him up."

Timothy Dale Cowart, Taylor's cellmate in jail, testified that Taylor made statements to him about the case.[6] Specifically, Taylor told Cowart that he and a partner were committing a burglary and "[t]hat it was a messy job, that the lady surprised him inside the trailer, and he stabbed her and then choked her and then had to strangle her with a cord to make sure she was dead." Cowart testified that Taylor stated that the State had taken hair and body samples and had done a rape test on him that could put him at the crime scene, but not his partner. Further, Taylor stated that his tissue and hair alone could convict him, and that the State also had recovered property removed from the home that could place him at the

---

6. Cowart testified to having at least five felony convictions in other states and "[f]our or five maybe six" misdemeanor convictions in Florida involving dishonesty. Cowart further indicated that, in exchange for his sworn statement in Taylor's case, he received a sixty-day sentence and probation on the petit theft case he was in jail for at the time of Taylor's alleged statements.

scene. Cowart also indicated that Taylor had asked him to obtain a gun and a handcuff key and place it in a hospital bathroom so that Taylor could escape.

We conclude that the Dixon affidavit would not produce an acquittal on retrial because it does not present any information disputing or explaining the statements made by Taylor as to the murder. Instead, Taylor's statements to Detective Bogers and Cowart link him to the crimes for which he was convicted, and Dixon's suggestion that another individual might have committed the murder does not eradicate these statements. Moreover, when considered alongside evidence presented at trial matching Taylor's DNA profile to the DNA recovered from a stained blouse found at the scene and the evidence and testimony presented with regard to the recovery of the sailboat pendant, Dixon's affidavit has little to no effect on the probability of acquittal on retrial.

For the reasons discussed above, we conclude that Dixon's affidavit fails the *Jones* test when considered alongside the evidence and testimony in the trial record, because the information it contains is refuted by the record and thus would not produce an acquittal on retrial. Therefore, we hold that the postconviction court did not err in summarily denying this claim of Taylor's successive motion for postconviction relief.

## C. Newly Discovered DNA Evidence

Taylor next asserts that two pieces of newly discovered DNA evidence entitle him to relief: (1) disagreement between the procedures used by Dr. Pollock in matching Taylor's DNA to semen found on the victim's blouse and the opinion of Shirley Zeigler, another DNA analyst, on more appropriate testing procedures, and (2) new developments in Taylor's codefendant's case challenging the DNA testing of hair fibers found at the crime scene. As discussed below, we hold that neither of the two alleged pieces of newly discovered evidence constitute newly discovered evidence that would entitle Taylor to relief.

First, with regard to the alleged disagreement between Dr. Pollock and Zeigler as to the appropriate DNA testing procedures to be used, we conclude that the postconviction court was correct in summarily denying this claim, finding that it is not newly discovered evidence, because the claim was previously raised—and denied by this Court—in Taylor's initial postconviction motion. *Taylor II*, 62 So. 3d at 1111, 1115-17. Additionally, even if this evidence were newly discovered, we conclude that it would not produce an acquittal on retrial because, as we stated in *Taylor II*, "although Zeigler testified during postconviction proceedings that there were differences between her report and that of Dr. Pollock, *she did not disagree with Dr. Pollock's ultimate findings*." *Id.* at 1112 (emphasis added). Therefore, Zeigler's testimony, if introduced on retrial, would not controvert Dr.

Pollock's ultimate finding matching Taylor's DNA to the semen found on the victim's blouse and thus would not produce an acquittal on retrial. Therefore, we hold that the postconviction court did not err in denying this portion of Taylor's newly discovered DNA evidence claim.

Second, with regard to the hair samples that were matched to Murray, we again conclude that the postconviction court was correct in summarily denying this claim because it is neither newly discovered nor would it produce an acquittal on retrial. In essence, Taylor argues that Murray's challenge to the hair fibers found at the crime scene entitles him to relief because it indicates that he was not the perpetrator. This claim is meritless. As an initial matter, the hair fibers are not newly discovered, as they were presented at Taylor's initial trial in 1991. Furthermore, as explained above, the defense presented Agent Dizinno's testimony matching Murray's hair sample, not Taylor's, to the hair fibers recovered at the scene, in order to present a theory of the case that someone other than Taylor murdered Ms. Vest. Although Murray now challenges the testing procedures used in matching his hair to those recovered from the scene, this has no bearing on Taylor's guilt or innocence. Taylor is linked to the crime scene through a DNA match of semen recovered from a blouse in Ms. Vest's trailer. Presenting further evidence that the hair recovered from the scene does not match Taylor's would not produce an acquittal on retrial. Instead, this evidence would be cumulative

evidence attempting to show that someone other than Taylor committed the murder, a proposition that was already presented to—and rejected by—the jury at trial. Thus, the "new" evidence relating to hair fibers from the crime scene would not produce an acquittal on retrial. Therefore, we conclude that the postconviction court did not err in summarily denying this claim of Taylor's successive postconviction motion.

## D. Cumulative Analysis

Although not explicitly conducted by the postconviction court below, this Court has emphasized the need to conduct a cumulative analysis in newly discovered evidence claims. *Hildwin*, 141 So. 3d at 1184. For this cumulative analysis, we have explained the need to consider all of the evidence of the case, including testimony that was previously excluded as procedurally barred or presented in another postconviction proceeding in determining the probability of acquittal on retrial. *Id.* Accordingly, below we conduct a cumulative analysis in order to comprehensively assess the probability of acquittal on retrial.

When examining the newly discovered evidence presented, in addition to the evidence previously presented at trial and in prior postconviction claims, such as Zeigler's disagreement with Dr. Pollock's DNA testing procedures, we conclude that the postconviction court was correct in denying Taylor's successive postconviction motion because none of the new or previously presented evidence

- 24 -

would likely produce an acquittal on retrial. The newly discovered evidence and claims Taylor raised in his prior postconviction motion do not refute the evidence linking him to the murder of Ms. Vest.

Namely, if Zeigler were presented to testify on retrial, her testimony would reflect that she ultimately agreed with Dr. Pollock's conclusion that the semen found on Ms. Vest's blouse was a direct match to Taylor's DNA profile. This direct evidence linking Taylor to the scene of the crime would not be refuted by the presentation of Zeigler as an additional witness and thus would not produce an acquittal on retrial.

Similarly, as discussed at length above, neither the presentation of Dixon as an additional witness to testify as to Holton's alleged involvement in Ms. Vest's murder nor the presentation of additional evidence on the hair samples from Murray's case would refute the evidence in the record matching Taylor's DNA profile to the semen recovered at the crime scene. Additionally, this new evidence would not undercut the fact that Ms. Vest's jewelry was found at Taylor's old residence and multiple witnesses testified that he returned to the residence seemingly in an attempt to recover the jewelry. Ultimately, even with the presentation of the newly discovered evidence and testimony from Taylor's prior postconviction claims, the evidence in the record against Taylor is abundant and essentially unrefuted. Therefore, we conclude that, even in conducting a

cumulative analysis, the evidence in question would not produce an acquittal on retrial.  *See id.*

## CONCLUSION

For the reasons discussed above, we affirm the postconviction court's denial of Taylor's second successive motion for postconviction relief.

It is so ordered.

CANADY, C.J., and LEWIS, QUINCE, POLSTON, LABARGA, and LAWSON, JJ., concur.
PARIENTE, J., concurs in result with an opinion.

ANY MOTION FOR REHEARING OR CLARIFICATION MUST BE FILED ON OR BEFORE DECEMBER 27, 2018.  A RESPONSE TO THE MOTION FOR REHEARING/CLARIFICATION MAY BE FILED ON OR BEFORE JANUARY 2, 2019.  NOT FINAL UNTIL THIS TIME PERIOD EXPIRES TO FILE A REHEARING/CLARIFICATION MOTION AND, IF FILED, DETERMINED.

PARIENTE, J., concurring in result.

I concur in result regarding the newly discovered evidence claims.  As to the *Hurst*[7] claim, I write separately to emphasize how Steven Taylor's case demonstrates precisely why this Court's cut-off for *Hurst* retroactivity results in unconstitutional arbitrariness.  Taylor's conviction became final in 1994.  *Taylor v. State*, 630 So. 2d 1038 (Fla. 1993) (direct appeal), *cert. denied*, 513 U.S. 832

---

7.  *Hurst v. State* (*Hurst*), 202 So. 3d 40 (Fla. 2016), *cert. denied*, 137 S. Ct. 2161 (2017); *see Hurst v. Florida*, 136 S. Ct. 616 (2016).

(1994). On the other hand, because Gerald Murray, Taylor's accomplice who was convicted for the same 1990 murder as Taylor, received three retrials, his conviction did not become final until 2009. *Murray v. State*, 3 So. 3d 1108, 1113 & n.2 (Fla.), *cert. denied*, 558 U.S. 949 (2009).[8] And, even though both defendants received nonunanimous recommendations for death—Taylor received a ten to two jury recommendation for death and Murray received an eleven to one jury recommendation—Murray will receive a new penalty phase because of the procedural history of his case, but Taylor will not. *See Taylor v. State*, 234 So. 3d 649 (Fla. 2018).

Therefore, Taylor's case is a clear example of the unconstitutional arbitrariness caused by the bright line this Court created for *Hurst* retroactivity— that *Hurst* does not apply retroactively to sentences of death that became final before *Ring v. Arizona*, 536 U.S. 584 (2002).[9] In my concurring in part and dissenting in part opinion in *Asay V*, I explained:

> I conclude that *Hurst* should apply to all defendants who were sentenced to death under Florida's prior, unconstitutional capital sentencing scheme. The majority's conclusion results in an

8. *Murray v. State*, 838 So. 2d 1073 (Fla. 2002) (reversing Murray's convictions and vacating sentences on direct appeal after first retrial); *Murray v. State*, 692 So. 2d 157 (Fla. 1997) (reversing Murray's convictions and vacating sentences on direct appeal after original trial).

9. *Hitchcock v. State*, 226 So. 3d 216 (Fla.), *cert. denied*, 138 S. Ct. 513 (2017); *Asay v. State* (*Asay V*), 210 So. 3d 1 (Fla. 2016), *cert. denied*, 138 S. Ct. 41 (2017).

unintended arbitrariness as to who receives relief depending on when the defendant was sentenced or, in some cases, resentenced. For example, many defendants whose crimes were committed before 2002 will receive the benefit of *Hurst* because they were previously granted a resentencing on other grounds and their newest death sentence was not final when *Ring* was decided. To avoid such arbitrariness and to ensure uniformity and fundamental fairness in Florida's capital sentencing, our opinion in *Hurst* should be applied retroactively to all death sentences.

210 So. 3d at 36 (Pariente, J., concurring in part and dissenting in part) (footnote omitted). Indeed, I have continuously expressed this view, including in this Court's recent opinion denying Taylor *Hurst* relief under *Hitchcock*. *Taylor*, 234 So. 3d at 650 (Pariente, J., concurring in result).

Taylor's case is the textbook example of the "unintended arbitrariness" I pointed out in *Asay V*. 210 So. 3d at 36 (Pariente, J., concurring in part and dissenting in part). Taylor and Murray were both convicted of first-degree murder and sentenced to death after nonunanimous jury recommendations for death for the murder of Alice Vest in September 1990. *Murray*, 3 So. 3d at 1113 & n.2; *Taylor*, 630 So. 2d at 1039. Yet, only one will receive a new penalty phase. Clearly, the Court's line-drawing for the retroactivity of *Hurst* creates unconstitutional results for defendants like Taylor.

An Appeal from the Circuit Court in and for Duval County,
    Russell L. Healey, Judge - Case No. 161991CF002456AXXXMA

Michael P. Reiter, Ocala, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, and Jennifer A. Donahue, Assistant Attorney General, Tallahassee, Florida,

for Appellee